## COURT OF APPEALS.

### April 26, 1921.

## THE PEOPLE v. HATTIE DIXON.

(231 N. Y. 111.)

(1) MURDER—UNSUBSTANTIAL ERRORS ON TRIAL WILL NOT WARRANT REVERSAL OF CONVICTION.

Where defendant has on the whole had a fair trial with no substantial error which might tend to influence the verdict appearing on the record, the Code requires (Code Crim. Proc., § 542), and this court recognizes, that the judgment of conviction should be affirmed. (People v. Sprague, 217 N. Y. 373, 379, followed.)

(2) SAME—CODE CRIM. PROC., § 542—"OTHER EVIDENCE."

Under the provisions of section 399 of the Code of Criminal Procedure, the "other evidence," required to corroborate testimony of an accomplice, must be such "as tends to connect defendant with the commission of the crime." It need not show the commission of the crime; it need not show that defendant was connected with the commission of the crime. It is enough if it tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the accomplice is telling the truth. The corroboration is not restricted to any particular point; its connection with defendant's own statements and denials should be considered and it may vary in its nature according to the circumstances of the particular case.

(3) SAME—WHEN ERROR MAY NOT BE PREDICATED UPON SENTENCE OR TWO OF CHARGE READ SEPARATELY.

Where upon a trial for murder in the first degree the entire charge indicates clearly that the trial judge found evidence to submit to the jury for them to say *first* whether it was worthy of belief, and *secondly,* whether if true it tended to connect defendant with the commission of the crime, error may not be predicated upon the fact that a sentence or two read separately might be construed to suggest that the court found as matter of law that the evidence of an accomplice was corroborated.

(4) SAME—WEIGHT OF CORROBORATING TESTIMONY FOR THE JURY.

Evidence relied upon by the People as corroborative tended to establish as a fact that before defendant could have known how the victim had been killed, except from her accomplice, she told others the girl had been hit or first hit on the head with a stone. In reply to a question by a juror as to whether there was any evidence that defendant had been told at the police station, before she made the statements testified to that the girl had been hit on the head with a stone, the court answered, "Well, I don't remember any such testimony. If there was any such testimony, and you invite my attention to it, I will have it read." *Held,* no error, where no one, not even the defendant himself, testified that she was told at the police station that deceased was hit or first hit on the head with a stone. It was for the jury to determine what the defendant said to the witnesses and whether or not she might have obtained enough information at the police station or elsewhere to justify what she said.

(5) SAME—DEPARTURE FROM THE RECORD IN SUMMING UP MANIFESTLY IMPROPER, BUT NOT REVERSIBLE ERROR WHERE COURT DIRECTED JURY TO DISREGARD THE STATEMENT.

In the summing up the prosecuting attorney, departing from the record, said that defendant's own son confessed and told the story that defendant was the one who instigated the crime. *Held,* manifestly improper, but that under the circumstances it cannot be said that the statement was of "a character calculated to irrevocably affect and sway the minds of the jurors," where no objection this reference to the son's confession was stricken out and the district attorney was told to confine himself to what the other accomplice said in the case.

(Argued March 21, 1921; decided April 26, 1921.)

APPEAL from a judgment of the Bronx County Court, rendered May 26, 1920, upon a verdict convicting the defendant of the crime of murder in the first degree.

*John William Smith* and *Robert P. Lattimore,* for appellant. Justice requires the reversal of the judgment of conviction in

this case, and requires that the defendant be discharged from custody. (People v. Becker, 210 N. Y. 274; People v. O'Farrell, 175 N. Y. 323; People v. Butler, 62 App. Div. 508; People v. Walton, 159 App. Div. 289; People v. Shaw, 158 App. Div. 146; People v. Haischer, 81 App. Div. 559; People v. Abraitis, 189 App. Div. 312; People v. White, 62 Hun, 115; People v. Talesnik, 225 N. Y. 489; People v. Plath, 100 N. Y. 59; Frazer v. People, 54 Barb. 306.)

*Edward J. Glennon, District Attorney (Albert Cohn and James A. Sullivan,* of counsel), for respondent.    There was ample evidence to corroborate the testimony of the accomplice, Theodore Scott.    (People v. Becker, 215 N. Y. 126; People v. Cohen, 223 N. Y. 406; People v. O'Farrell, 175 N. Y. 323; People v. Butler, 62 App. Div. 508; People v. Walton, 159 App. Div. 289; People v. White, 62 Hun, 114.)    The court committed no error in reading from its own minutes the testimony of Captain Wines and Detective Armstrong.    (People v. Buccufurri, 154 App. Div. 827; Burke v. Baker, 104 App. Div. 26; Ditmas v. McKane, 87 App. Div. 54.)

POUND, J.:

On November 16, 1918, in the afternoon, the dead body of a young colored girl, Margaret Hooper, also known as Margaret Morton and Margaret Dixon, was found in Franz Siegel Park in Bronx county.    It lay between two hills of rock.    The girl had been strangled to death.    Six strands of cord were tied tightly around her neck.    The hands were tied behind the back with corset strings.    The body lay face downwards.    The assistant medical examiner was immediately summoned.    He found a rock as big as one's fist resting upon her head.    Photographs at once taken of the body show this piece of rock.    A hat alongside of the body had in it a scrap of paper with the address " 12 West 134th Street, ground floor," written on it. At this address lived people who knew the girl but had no reason

to desire her death. No signs of a struggle or disturbance were visible, but the body was sprinkled with loose dirt.

Margaret had been living in the family of defendant Hattie Dixon, who was a negro woman, for about two months before her death, at 20 West One Hundred and Thirty-seventh street, but they were not related. Defendant's son, Theodore Dixon, sixteen years oll, was a member of the family and Theodore, or Henry, Scott, another colored boy of about the same age, was a frequent visitor at the Dixon home. Defendant had an insurance policy for $500 on Margaret's life, payable to her, and it also might be found by the jury on the evidence that she had $100 of Margaret's money in her control and that Margaret was about to leave defendant and return to Richmond, Virginia, her native town.

Defendant and the two boys were jointly indicted for the crime of murder in the first degree. On the separate trial of this defendant, Scott was a witness for the People. He thereafter pleaded guilty to manslaughter, first degree. He testified that on Monday, November 11, defendant at her home proposed to him that he get Margaret out of the way, saying there was $200 in it. The next day he says the matter was again taken up by defendant with him and the Dixon boy and then she outlined to them the course they were to pursue. They were to take the girl over the bridge over One Hundred and Thirty-eighth street, have sexual intercourse with her, and after they had got her there and after they had had intercourse with her, Scott says the defendant's instructions were: " You (Scott) hit her on the head with a rock, tie her hands, hold her feet while you choke her with a rope, then turn her over on her face and put a rock alongside of her head, and put the note (the paper with the address on it) in the hat and come away." On Wednesday Scott says he had a talk with defendant and she said to him, " You are not going democrat on me? " and he said he did not know. That expression meant among these people, defendant said on her cross-examination, " going back on

anybody." On the following Friday, November 15, Scott says he came to the Dixon house in the evening. Defendant provided him with the note and the cord. He then asked Margaret to go to a show and she said she would go if Dixon went. They were all very friendly together and Scott swore that she had previously indulged him in sexual intimacies. Then, his testimony continues, they went over the One Hundred and Thirty-eighth street bridge to the place where the body was found and carried out the plan exactly as they had been previously instructed by defendant. The boys then came back to the Lincoln Theater at One Hundred and Thirty-fifth street, where Scott says defendant sent an usher for him and he came out. She asked him " did you do it?" and he said " yes," and gave her the exact details of the crime. He says she said " well done " and gave him a $5 bill. The next day he says she told him when he asked her for the money that she had $500 on Margaret's life and as soon as she got the money she would give him and Dixon $100 apiece. This evidence of Scott was uncorroborated except by evidence offered by the People of circumstances which was relied on merely to tend to connect defendant with the commission of the crime.

Defendant was examined at length as a witness in her own behalf and denied generally and with circumstance all guilty knowledge of or connection with the death of the girl. She said that on Saturday, the day the body was found, the detectives came after her, told her that they had found Margaret wandering around in the park, and took her to the police station and questioned her about the girl. That she was then told by the man behind the desk at the police station for the first time that Margaret was dead; that he also said to her: " She was found over in some lot the other side of the park with a rope tied around her neck, her hands tied behind her *and a stone lying on her head,*" and that was the first she knew of the death. She was then taken to the morgue where she identified the girl's body.

Scott, the accomplice, was a depraved boy so destitute of sensibility that he could deliberately gratify his lust on the girl he thereupon killed in cold blood. To obtain some remission of his own crime such a one might not stop at murder by the false oath by implicating others. It becomes a matter of consequence to determine whether the jury might find in the evidence facts which if believed would be found by it to be corroborative of his evidence.

At common law, while a jury might convict on the evidence of the accomplice alone, it became the general practice of judges to advise juries not to convict of felony unless such evidence was corroborated by other evidence. In regard to the manner and extent of the corroboration required, differences arose. (Greenleaf on Evidence, §§ 380, 381.) These differences are reconciled by the provision of section 399, Code Criminal Procedure. The "other evidence" must be such "as tends to connect defendant with the commission of the crime." The corroborative evidence need not show the commission of the crime; it need not show that defendant was connected with the commission of the crime. (People v. Mayhew, 150 N. Y. 346, 353; People v. Cohen, 223 N. Y. 406, 426.) It is enough if it tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the accomplice is telling the truth. The corroboration is not restricted to any particular point. Its connection with defendant's own statements and denials should be considered. (People v. Becker, 215 N. Y. 126, 140.) It may vary in its nature according to the circumstances of the particular case. Matters in themselves of seeming indifference or light trifles of the time and place of persons meeting may so harmonize with the accomplice's narrative as to have a tendency to furnish the necessary connection between defendant and the crime. The learned trial judge, in the main fairly instructed the jury in this regard. If a sentence or two read separately might be construed to suggest that he found as matter of law

that the evidence of Scott was corroborated, the entire charge indicates clearly that he found evidence to submit to the jury for them to say *first,* whether it was worthy of belief, and *secondly,* whether if true it tended to connect defendant with the commission of the crime.   In that he committed no error. The testimony of the boy Cruse, a companion of Scott and Dixon, that he heard defendant ask Scott if he was going democrat on her and also that at the Lincoln Theater on Friday night he saw her give Scott money, coupled with her denial in both instances, if believed, might tend to furnish a link in the chain of evidence.   The possession of the insurance policy by defendant, her inquiries on the night of the killing and the next day at No. 12 West One Hundred and Thirty-fourth street, ground floor, and other minor circumstances also properly addressed themselves to the attention of the jury in this connection.   But perhaps the most significant of all the corroborative evidence is that which was relied on by the People to establish the fact that before defendant could have known how Margaret had been killed, except from Scott, she told others, called as witnesses by the People, that the girl had been hit or first hit on the head with a stone.   It would point directly to the truth of Scott's narrative if it appeared that defendant had information about this circumstances of the killing at a time when it could come to her only from Scott or her son.   The theory of the People was that, although these conversations took place after her visit to the police station and morgue, it was not known until November 26 that Margaret had been struck with a stone, when Scott made a statement to that effect. That she was informed that the girl was found dead with a stone on her head is not only not denied but is not improbable, for the assistant medical examiner, a police officer and the photographer saw the stone on the head of the dead body and the photograph shows it.   Nothing in the record suggests the slightest misunderstanding as to this fact, but it is not conclusive.   The jury seems to have been considering just what

she testified she was told at the police station and just what she said to witnesses and how far the two statements might have been inconsistent. It returned into court for further information and thereupon a colloquy took place as to which complaint is made that the trial judge fell into serious error in stating the evidence to the jury, or in failing to state material evidence. The foreman said:

" Your Honor, I would like to have the portion read which relates to Hattie Dixon's conversation with two of the witnesses, I believe, about the Morton girl being struck on the head, prior to the time she heard it in the Court House " (*i.e.,* prior to November 26, when Scott made his statement in the presence of defendant).

The stenographer then read from the testimony of Edward Williams and Mrs. Waters as to conversations testified to by them as occurring on Sunday, November 17, and Monday, November 18, both after defendant's visit to the police station on Saturday, November 16. Williams said she told him that the men came on Saturday to tell her the girl was found dead in the Bronx " and that she told him *she had been hit on the head with a stone.*" Mrs. Waters said the defendant said the detective had taken her up at some place where the girl was and they told her that " *she was hit with a stone first, hit on the head with a stone* and the stone was found on her neck." Defendant had admitted that she had conversation with these witnesses but had denied that she had said to them that the girl *had been "hit, or first hit, on the head with a stone,"* and asserted that she told them merely that Margaret was found with a stone *"lying on her head."* The distinction between the two statements is definite and significant. Thereafter the third juror asked the following question:

" Third Juror: Is there any evidence that Mrs. Dixon was told up at the police station on Saturday that the girl had been hit on the head with a stone ?"

If we omit a slightly misleading portion of the colloquy,

wherein the form of this question was materially changed by statements of defendant's counsel, we have the answer of the judge to the juror's question as follows:

" The Court: Well, I don't remember any such testimony. (To defendant's counsel) If there was any such testimony and you invite my attention to it I will have it read."

Reading the question of the third juror and the answer of the judge consecutively as the sense suggests, we find no error, for the reason that no one—not even the defendant herself— testified that she was told at the policee station on Saturday that deceased was " hit, or first hit on the head with a stone."

The jury must have so understood the evidence and counsel must have so understood it for the colloquy then goes off on the question of the eighth juror as to whether there was " any testimony offered to the fact that anything was *published* that she was hit on the head by a stone." Something vague and inconclusive in connection with newspaper accounts of the murder, not in evidence, had been testified to by a man who could not read and another who said merely that he saw in the paper that Margaret was found dead, and the judge considerately said that the jury would have to determine that question from the evidence. when he might well have said that he recalled no evidence to that effect, for there was none. If a newspaper account of the homicide had contained the statement that the deceased was 'killed by being first hit on the head with a stone, the probabilities are that we would not now be left to speculate on its contents. It was for the jury to determine what the defendant said to the two witnesses and whether or not she might have obtained enough information innocently at the police station or elsewhere to justify what she said. The judge unnecessarily read from his notes the evidence of the policemen Armstrong and Wines which was not asked for, but on the whole record, he seems to have kept the scales of justice on a balance.

By oversight or mistake, slips may occur in the progress of a

long trial which may be fully and fairly corrected or may be of no consequence. This court has no disposition to exaggerate such inadvertencies into undue importance. Where defendant has on the whole had a fair trial, with no substantial error which might tend to influence the verdict appearing on the record, the Code requires (Code Crim. Pro. § 542) and the court recognizes (People v. Sprague, 217 N. Y. 373, 379) that the judgment of conviction should be affirmed.

In the summing up of the assistant district attorney a blunder occurred. Departing from the record on this trial, he said that defendant's own son had confessed and told the story that defendant was the one who instigated the crime. This was manifestly improper, but under the circumstances it cannot be said with any degree of confidence that the statement was of "a character calculated to irrevocably affect and sway the minds of the jurors." (People v. Manganaro, 218 N. Y. 9, 17.) On objection this reference to the son's confession was stricken out and the district attorney was told to confine himself to what Scott said in this case. Counsel for the defense do not now complain that this remark deprived their client of a fair trial. The record reveals that Theodore Dixon had been previously convicted of murder in the first degree on this indictment. It is almost inconceivable that this slip turned the balance against the defendant and should, for justice's sake, cost the People their verdict. (People v. Watson, 216 N. Y. 565.)

In a case where the question is as to the corroboration of an accomplice who testifies that he killed, not in the heat of passion, but for the promise of $100, it would be better that the case be retried than that a reasonable feeling should remain in the minds of the court that the verdict was unfairly influenced either by a mistaken idea of the evidence on an essential circumstance or by an incriminating fact not in evidence or by both. This woman should be put to death only after conviction on evidence that might satisfy fair men sitting as jurors that they were making no mistake on the facts. The circum-

13

stances of the crime were unusual, although not improbable when contrasted with the records of other murders of greed committed in New York and elsewhere. The falsely accused and the guilty are alike entitled to the protection of the rules of law which insure a fair trial; to safeguard the innocent the rights of the guilty must be maintained. But we are unable, after a careful review of the record, including an examination of all the points made by industrious counsel which are not herein specifically discussed, to find legal error of substance or justification for the belief, which should exist before we assume the responsibility of reversing a judgment of conviction, that defendant did not have a fair trial at the hands of a careful judge and an intelligent jury.

The judgment of conviction should be affirmed.

CRANE, J. (dissenting). The conviction in this case should be reversed. Errors have been committed in my judgment which should not be disregarded under section 542 of the Code of Criminal Procedure.

On November 15, 1918, Friday night, a young girl named Margaret Morton was murdered in the lot at One Hundred and Fifty-third street and Gerard avenue, Bronx county in the city of New York. Two young men named Theodore Dixon and Henry Scott killed her. Scott hit her on the head with a rock, Dixon tied her hands behind her back while Scott strangled her to death with a cord. Her body was discovered Saturday afternoon covered with dirt and with a rock on her head. Dixon was found guilty and his sentence commuted to life imprisonment. A plea of manslaughter was taken from Scott, apparently because he turned state's evidence. This defendant, Hattie Dixon, the mother of Theodore Dixon, took no part in the direct act of killing. She was miles away from the scene of the homicide. Her participation in the occurrence is made out solely by the story of Scott whose life has been spared.

Margaret Morton was about seventeen years of age and had

lived for some time with Hattie Dixon and her son at 20 West One Hundred and Thirty-seventh street in the borough of Manhattan. At her own instigation Margaret had insured her life for $500, naming Hattie Dixon as the beneficiary. Scott testified that Hattie Dixon asked him to kill Margaret Morton so that she, Mrs. Dixon, could get the insurance money. She promised him out of it $100. Scott says that this defendant gave him the cord and told him to take Margaret over the bridge into the Bronx lots, hit her on the head with a rock and strangle her.

The claim of the prosecution is that Dixon and Scott, the actual murderers, were carrying out the instructions of this woman.

Section 399 of the Code of Criminal Procedure provides that a conviction cannot be had upon the testimony of an accomplice unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the crime.

There was evidence given in the case in the nature of corroboration every bit of which, standing alone and apart, was free from any evil construction or criminal purpose. A man named Kruse testified that on Friday night, the night of the murder, he saw the defendant hand Scott $5 on the street in front of a moving picture place. The insurance agent who collected weekly the premiums on the policy says that when he called for the money the week after the killing Mrs. Dixon told him that Margaret was dead and asked about the collection of the principal.

Other witnesses gave evidence that on Friday night and on Saturday afternoon Mrs. Dixon was searching the neighborhood for Margaret and inquiring about her. But the most important piece of corroborating testimony consisted of statements made on Sunday, the 17th, to Edward Williams, and on Monday, the 18th, to Amelia Waters. To these persons the defendant stated that Margaret had been found in the Bronx and had been hit on the head with a stone.

Scott testified that on Friday night after the killing he told Hattie Dixon, when she gave him the $5 that he had killed Margaret and hit her on the head with a stone, choked her with the cord while Dixon tied her hands behind her back.

The point of the corroboration pressed by the People upon the jury in the summing up was that Mrs. Dixon could not have known on this Sunday or Monday that Margaret was hit on the head with a stone, except from the information given her by Scott. This was very important. It was a piece of corroboration which, if true, indicated criminal knowledge, as Mrs. Dixon, on Saturday afternoon, was hunting for Margaret among the neighbors. The explanation of how this knowledge was obtained is very simple. After Margaret's body was found on Saturday afternoon, November 16th, the police officers called on Hattie Dixon to go with them to the morgue to identify the body. She was taken after six o'clock Saturday evening to the Forty-ninth precinct where she was notified that Margaret was dead. She testified that the man behind the desk in the station house informed her how she was found, that she was found with a rope around her neck, hands tied behind her, laying face down with a rock on her head.

There is no dispute in the case but that Margaret was thus found. Officers Riegelman and Carmody, who first saw the body in the lot, found a piece of rock about as big as your fist, weighing about eight pounds, on the girl's head, and she was photographed with the rock on her head.

This testimony of Mrs. Dixon is not contradicted. Officer Armstrong testified that on Saturday evening in the station house Hattie Dixon was notified by the officer of Margaret's death. Neither the man behind the desk nor any of the officers who were in the station house on that night and who were in the court room at the trial contradicted Hattie Dixon's testimony that the man behind the desk told her how Margaret was found and that a rock was on her head.

I find nothing in the record to sustain the claim that on the

following Sunday and Monday when Hattie Dixon told her friends that Margaret had been hit on the head with a rock she must have acquired that information from Scott on Friday night and could not have acquired it at the station house Saturday night.

The importance of this claimed corroboration is flashed upon us by the jury which had much hesitancy in convicting.

After being out two hours the jury returned with questions bearing upon this incident of the conversations. The third juror asked this question: "Is there any evidence that Mrs. Dixon was told up at the police station on Saturday that the girl had been hit on the head with a stone?"

The court referred the jury to the testimony of Detective Armstrong and read from his own minutes. He told the jury that in the detective bureau she was informed that Margaret was *dead.* "*That's all.*"

The judge said: "That is all my minutes show."

The defendant's lawyer thereupon made this statement:

"Mr. Smith: If your honor please, my understanding is that the juror asked whether there was anything to contradict the testimony of Hattie Dixon to the effect that the man behind the desk in the police station told her that the girl had been found with the rope around her neck and a stone on her head or something to that effect or whatever it was and I understand that to be what the jury is asking.

"The Court: Well, I don't remember any such testimony. If there was any such testimony and you invite my attention to it I will have it read.

"Mr. Smith: Yes, sir, I can invite your attention to that.

"The Court: Before I get to that I am going to adopt the suggestion of Assistant District Attorney McLaughlin with reference to the testimony of Captain Wines."

Captain Wines' testimony was given and the court sent back the jury without making any reference whatever to the testimony of the defendant or permitting her counsel to read it after

the court had invited him to do so. Smith was the defendant's lawyer. He said, as will be noted, that the testimony of Hattie Dixon was to the effect as above given.

The court dismissed it with the statement that he recollected no such testimony. In fact he went further and told the jury that his minutes showed that the defendant was simply told in the station house that the girl was dead—"*that's all.*"

In response, therefore, to the question of the third juror, the court instructed the jury that there was no testimony that the defendant was told in the station house Saturday night that the girl had been hit on the head with a rock or was found with a rock on her head. And this in the face of testimony given by the defendant uncontradicted by the police officers listening to her testify.

It must be remembered that Hattie Dixon was not in the station house Saturday night as a prisoner. That was the evening of November 16th, and she was not arrested until November 21st. She was there to identify the body and was taken from the station house that evening to the morgue and after that sent home. Why should the officers refrain from telling her the condition in which the girl had been found when everybody connected with the case knew it and a photograph had even been taken with the rock on the girl's head?

When a jury is seeking light and is kept in the dark upon the most critical point in the case, it cannot, to my mind, be said that a harmless error has been committed and the defendant not prejudiced.

There is another error in this case, which might not be fatal but for the nature of the prosecution, resting as it does almost entirely upon the testimony of an accomplice. In summing up the zealous prosecutor said to the jury: "You won't expect a woman of that type to confess. You would expect two young fellows, just as I said before, over the borderline from boyhood into youth to confess, and they did, gentlemen, and they did tell the story that this defendant was the one who

instigated the crime in this case." No such evidence appeared in the case; it would have been incompetent and reversible error if it had. The impropriety of the district attorney stating that one of the murderers, not a witness, had confessed that this defendant was the one who instigated the crime needs no comments. We have heretofore ruled upon such statements. (People v. Esposito, 224 N. Y. 370.)

The judge should have left no doubt in the minds of the jury that such a remark was highly improper and that they should disregard it. The young counsel for the defendant moved to strike out the reference to Dixon altogether and the court said, " Very well, it is so ordered," remarking that he thought it safer to confine the summing up to what Scott had said in the case. In a civil case when testimony is stricken out the court frequently impresses upon the jury their duty to disregard it. How much more important such an instruction becomes in a case of murder in the first degree, whether requested or not. When death may be the result of a verdict it is the duty of a court to see that none but proper evidence is received irrespective of objection and that the usual forms and procedure are adhered to. Minor departures there must be in long and exhausting trials, but serious lapses should not be overlooked. Striking out testimony is a frequent occurrence. I never before heard of striking out a summing up. I appreciate what was meant by the learned judge, but the question is, did the jury?

By insisting that these two errors require a reversal of this judgment I feel confident that I am adhering to the traditions of this court. A New York bank president was once charged with stealing depositors' money. He was readily convicted. Because the entire panel of jurors including the twelve men in the box had been drawn one hour before the time ordered, the conviction was reversed. Neither the defendant nor his counsel were shown to have been present at the hour properly set for

the drawing, but the error was *presumed* harmful.    (People v. Damron, 212 N. Y. 256, 263.)

Hattie Dixon, a colored woman porter on the subway, is now under sentence of death.    The harm done by the error referred to on her trial need not be presumed; it can be seen and felt. It is no answer to say that upon the record she was clearly guilty; the jurors have not found it so easy to declare.    The jury upon the first trial disagreed, and the present jury, after coming back for the instructions above stated, took eight hours to arrive at a verdict.

By reason of these rulings to which I have referred, emphasized in a case resting almost entirely upon the testimony of a self-confessed murderer, I feel that the defendant should be granted a new trial.

The conviction should be reversed.

CARDOZO, J. (dissenting).    I think a new trial should be ordered in furtherance of justice.

We are slow to reverse upon the facts a verdict of guilt rendered by intelligent jurors with understanding of the evidence (People v. Cohen, 223 N. Y. 406, 423).    The measure of our faith is in some sense the measure of our duty to see to it that faith is justified.    We lose the right to put so much of the responsibility on others than ourselves, to lean so heavily on verdicts, if understanding of the evidence may be poisoned, and the verdict held as truth.

This jury wished to know whether there was any testimony that the defendant had been told at the police station that the girl had been hit on the head with a stone.    The prevailing opinion makes it plain how significant in support of innocence such testimony would be.    The trial judge said in effect that no such testimony was in the case.    He read the testimony of a detective that the defendant was informed that the girl was dead, and after reading that, he added, "That is all my minutes show."    The defendant's counsel then tried to direct attention

to other testimony. The defendant herself had testified that the man behind the desk at the station had said that the girl was found lying with a stone on her head. Not only had the defendant so testified, but no one had contradicted her. To this suggestion, the court responded: "Well, I don't remember any such testimony, and if you invite my attention to it, I will have it read." Counsel replied: "Yes, sir, I can invite your attention to that." Before he had a chance to do so, in the midst almost of his protesting words, "Just a moment now, if your honor please," and upon the suggestion of the district attorney that enough had been read, the jury was sent back.

We are told, in belittlement of all this, when the trial judge said, "I don't remember any such testimony," he was not referring to the defendant's testimony, which counsel was seeking to recall to him. He was referring, it is said, to the existence of something in contradiction of her testimony. The words that follow in which he invited counsel to direct attention to the testimony if it existed, and counsel's response to the invitation, show this construction to be untenable. The court was not inviting counsel to point out testimony prejudicial to the defendant which the court could not remember. Counsel was not asserting his ability to invite the court's attention to testimony prejudicial to his client which in fact did not exist. Invitation and response both demonstrate that court and counsel were in accord in their interpretation of each other's meaning. The one denied and the other asserted that the defendant had made the statements on the witness stand which counsel wished the court to place before the jury. The fact is that the statements had been made, and that the officer behind the desk, who could have contradicted them if false, was not a witness for the People.

In this tangle of misconceptions, I am fearful that the truth may have been smothered. A jury eager for light upon a point of crucial moment, avows itself in darkness, and for answer is confirmed in error. Ignorance, admitted at the beginning by

the request for information, is heightened and deepened by a response intended to dispel it. I think we should do wrong in upholding a verdict thus rooted in uncertainty. We do not help the case by saying that a judge is not required to state his recollection of the facts. The judgment, if it is to be sustained, must pass a deeper scrutiny. It is not enough to show that by the test of error of law there is no flaw in the instructions. What concerns us more profoundly is whether there is justice in the verdict. Justice is not there unless there is also understanding.

My vote is for reversal.

HISCOCK, Ch. J., CHASE and ANDREWS, JJ., concur with POUND, J.; CRANE, J., reads dissenting opinion and HOGAN, J., concurs with him; CARDOZO, J., reads dissenting memorandum concurring with CRANE, J.

Judgment of conviction confirmed.