THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* LOUIS J. FARONE, Appellant.

Third Department, July 8, 1954.

*James Carroll, Edward Amyot* and *Athena C. Kouray* for appellant.

*Nathaniel L. Goldstein, Attorney-General* (*Paul W. Williams, Peyton H. Moss* and *Arthur L. Harrow* of counsel), for respondent.

IMRIE, J. Defendant has appealed from a judgment of the Extraordinary Term of the Supreme Court, Saratoga County, convicting him of the crimes of conspiracy, being a common gambler, keeping a gambling and betting establishment, and receiving bets and wagers. He was tried on three indictments consolidated for trial. Each indictment charged him with the above crimes at a different establishment, viz., Riley's Lake House, The Brook, also referred to as Outhwaite's, and Smith's Interlaken, all located in Saratoga County. He was found guilty of conspiracy and of keeping a gaming and betting establishment under all the indictments, and of being a common gambler and receiving bets and wagers under the Riley and Smith's Interlaken indictments, but acquitted as to the two latter crimes at The Brook.

A common gambler is a person " who is the owner, agent, or superintendent of a place, or of any device, or apparatus, for gambling; or who hires, or allows to be used a room, table, establishment or apparatus for such a purpose ". (Penal Law, § 970.) Any individual or officer of a corporation, *inter alia*, " who keeps a room, * * * building, * * * or any other enclosure * * * used for gambling, * * * or being the owner or agent, knowingly lets or permits the same to be so used, is guilty of a misdemeanor." ( Penal Law, § 973.) Any person who aids, assists or abets in any of the acts proscribed in section 986 of the Penal Law, which includes the receiving of bets and wagers, is guilty of a misdemeanor.

Thus, importance attaches to defendant's interest in and connection with the three above properties in 1949. He did not appear as the holder of record title of any one of them, yet the testimony of the People's witnesses demonstrates his beneficial interest in and control of all. Title to Riley's Lake House then stood in the name of his wife. All details of its handling, of dealing with it and its control cleared through defendant. One Col-

lins, a relative, acquiesced in a request of defendant's brother, an attorney, to hold title to a part of this property as a favor to defendant. Collins did not know the property and would not have accepted title had he known that it contained a gambling casino. In early 1947 defendant sent him a deed which Collins executed and returned, by which title to that parcel was reconveyed to Mrs. Farone. In July, 1947, Samuel Arum and his associates organized the Lake Lonely Realty Corporation and purchased Riley's for cash and a purchase-money mortgage to defendant's wife. Eventually title reverted to Mrs. Farone through foreclosure of the mortgage. For reasons having to do with obtaining a liquor license, the corporation did not take record title to the casino parcel. Dealings for the property were entirely with defendant. While such interest on the part of a husband in his wife's property is not unique, the purport of all the evidence was such as to leave no reasonable doubt that defendant was not only in control of the property in all respects, but that his was the beneficial interest therein.

The Brook, except, apparently, the parcel on which stood the gaming casino, was in the name of Outhwaite's, Inc., in 1949. That corporation was without funds. Its only resource was the real estate, upon which was a mortgage held by defendant's sister, Laura Farone. The nominal title to this property had been put in one Moran, defendant's real estate broker, in 1936. In 1941 he conveyed to O'Reilly a portion on which was erected the casino. Moran did not know O'Reilly, but signed the deed as it was presented to him by defendant's attorney. In 1947, by separate deeds, Moran and O'Reilly conveyed the entire property to Outhwaite, who paid $10,000 cash and gave a mortgage for $35,-000 to Laura Farone. The record clearly indicates that defendant's freedom of action in his sister's business affairs was as unlimited as in those of his wife. By 1949 the mortgage on the property of this virtually insolvent corporation constituted a whip hand over it. After 1947 defendant again listed the property with Moran for sale. William G. Bradshaw, a former law partner of defendant's brother, testified that he worked for members of the Farone family. He identified a copy of a letter to defendant, dated June 30, 1949, reciting the enclosure of the corporate record book of Outhwaite's, Inc., with minutes of the last meeting, resolutions providing for a new mortgage to defendant and the sale of stock to him, as well as " all other papers pertaining thereto." It also listed a stock " Certificate No. 35, issued to Gilbert B. Outhwaite for 536 shares, and Certificate No.

36 issued in blank for 327 shares." There was further reference to the enclosure of instruments of title, including a deed, " Frances Burr to blank ", conveying property excepted in the deed of July 1, 1947, from Outhwaite to Outhwaite's, Inc.  Outhwaite has testified that, in dealing with defendant (not Moran, one of the holders of title), he was advised to put title to the casino lot in another name in order to safeguard the liquor license.  There was in existence a deed of an undescribed portion of The Brook property to Frances Burr from Outhwaite, dated July 1, 1947, and there was the recitation of a deed from her in blank, dated October 7, 1948 (cf. reference to copy of Bradshaw letter).  Frances Burr (Perella) could or would throw no light on her part in the overall picture, denying receiving or giving any such deeds or any knowledge whatever of the transaction.

As to Smith's Interlaken we find that Arum, an accountant, testified that in 1944 he, one Sullivan and Delmonico formed a corporation named Moon's Lake House, Inc., which acquired this property and sold it in 1947, ostensibly to defendant's wife, though title went into the name of Harry Coleman.  Coleman became the president of the new corporation, Interlaken, Inc., which took over the title.  James Sheedy, employed in a managerial capacity in a business operated by defendant, became a " dummy " vice president as a favor to Coleman.  He also worked at the dice table at Smith's in 1948 and 1949.  Coleman died in 1948.  His brother James, with no interest in the corporation, became president at the suggestion, as he testified, of defendant.  The examination of Weiskopf, an accountant for defendant, developed that, prior to the death of Harry Coleman, defendant owned two thirds of the stock of Interlaken, Inc., and in his Grand Jury testimony, read to him on the trial, he " believed " that thereafter defendant owned all the stock.  His testimony also developed that the 1948 and 1949 profits of the corporation went directly to defendant instead of the company.

The conclusive evidence of wide-open gambling at all of these spots in 1949 was not controverted.  The detailed and voluminous testimony reveals beyond reasonable doubt defendant's control over and definite beneficial interest in each, regardless of the bare record title of the particular property.  Various witnesses testified as to his activities in respect to all of the properties by way of placement of insurance, listings and dealings with the broker, activities between ostensible owners primarily interested in restaurant operation and groups, or " syndicates ", brought in to operate the casinos.  His accountant, Weiskopf,

described himself as defendant's " watchdog " over Outhwaite in 1948, after the latter had moved over to Riley's from The Brook. According to Outhwaite defendant was in on conferences growing out of the episode of the transfer of the Saratoga Golf Club party from The Brook to Riley's and the ill feeling consequent thereon. There was evidence as to defendant's activities in hiring casino operatives. Rent received in part, at least, in the interest of defendant's sister, as mortgagee of The Brook, was deposited in Mrs. Farone's account. Adolph Perrone, a dice table " box man " at Riley's in 1949, and a brother of one of the casino operators, testified for defendant. He stated that his brother would give him checks taken at the casino, which he took to defendant's plumbing shop and dropped through the mail chute in an envelope. The next day he received cash for the checks and turned it over to his brother.

Naturally, much of the testimony of defendant's many activities relative to the several properties and with their owners and/or occupants, and pointing to his interest in and control of them, came from the mouths of witnesses characterized as accomplices. Beyond that there was a wealth of detail from nonaccomplices and by way of documentary proof sufficient to establish the existence of the conspiracies to violate the law and guilt under the substantive counts. Testimony required to corroborate that of an accomplice need not establish that a defendant committed the crime of which he is accused. It must be such other evidence " as tends to connect the defendant with the commission of the crime." (Code Crim. Pro., § 399.) It " is enough if it tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the accomplice is telling the truth " (*People* v. *Dixon*, 231 N. Y. 111, 116), though it " must be evidence from an independent source of some material fact tending to show that defendant was implicated in the crime * * * . It may not depend for its weight and probative value upon the testimony of the accomplice. It need not, alone and by itself, establish that defendant committed the crime " (*People* v. *Goldstein*, 285 N. Y. 376, 382). Testimony of accomplices was plentifully corroborated in the required respects, to the end of demonstrating defendant's planned and concerted activities in the affairs and conduct of the group of gambling spots.

Defendant not only asserts the insufficiency of the evidence to support the jury's verdict, but contends that incidents connected with the trial and errors of the trial court, either individually or in the aggregate, call for reversal.

As the clerk was drawing jurors at the opening of the trial, it developed that numbers opposite jurors' names on the printed list furnished counsel, and also used by the clerk, differed from the numbers on the seven ballots which the clerk had drawn from the box. As a result some jurors called to the front were not those whose names had been drawn. After a lengthy colloquy and an inquiry by the trial court, during which defendant moved several times for a mistrial, the court directed the clerk to return the ballots to the box and to begin anew the drawing of the jury. No one of the jurors first called had been examined. Two of those whose names were drawn in the first instance were subsequently called, examined and excused. Five whose ballots had originally been drawn from the box were not again called. Defendant's contention is that the jurors were not drawn by lot and that he was denied the right to examine in order those jurors whose names were first drawn from the box, as provided by statute. (Code Crim. Pro., § 387.) This incident was an innocent error on the part of a court officer. The solution adopted by the court can in no sense be deemed to have been prejudicial to defendant. The error was, at the most, a technical one, which cannot be said to have affected the substantial rights of either party. (Code Crim. Pro., § 542.)

Near the end of the trial and on the last day at which evidence was taken an alternate juror, Mrs. Goldstein, approached the court to inquire concerning her projected vacation, then asking leave to speak to him alone about a matter pertaining to the trial. When she was told she could do so only in the presence of counsel for both parties, she expressed an unwillingness to speak before counsel as the matter was very trivial. Called to chambers and in the presence of counsel, she stated that about a week previously, as the jurors were on their way to lunch, she heard one of them say, " everybody knows that Farone is involved in gambling, that he is right up to his neck in it, and that he served a jail sentence." She was directed to return to the courtroom and not to talk about the matter with the other jurors. After a discussion with counsel the court reserved decision on the procedure to be followed. There ensued a brief court session at which the examination of defendant's final witness was completed and both parties rested. Following a further conference in chambers the court addressed the jurors, reminding them of his regular admonitions in accordance with section 415 of the Code of Criminal Procedure, and then asked them, individually, four questions designed to ascertain their continuing impartial-

ity and ability to consider the case on the evidence alone, as well as to ascertain whether they had acquired information about the case apart from the evidence which would render it unfair for them to continue to sit as jurors. No juror's answer indicating inability to consider the case impartially on the evidence, or disclosing the fact of information from other sources than the evidence, the trial was permitted to proceed to its end. After the rendition of verdict the trial court conducted an inquiry in which he limited the questioning of witnesses to himself. On oath Mrs. Goldstein confirmed her statement previously made by her and named Mrs. Williams, a regular juror, as the one making the remark she had reported. Mrs. Williams testified that she did not recall ever making the comment and that, as far as her recollection was concerned, she did not make the remark. She disclaimed any personal information about the defendant except that she had read in the papers that he was an ex-convict, that that knowledge was acquired before the trial started, and that it had nothing to do with her judgment or by way of influencing her verdict. At her request the court asked that any juror who had heard Mrs. Williams make any such remark at any time inform him, to which request there was no response.

It may be noted that defendant had made and taken appropriate objections and exceptions to the procedure adopted by the trial court.

Reference is made to the recent case of *People* v. *Cocco* (305 N. Y. 282). We think the instant case is distinguishable. In the *Cocco* case the court could and did accept as true that the prejudicial remark had been made as reported. Here such certainty did not exist and there was a question of veracity. Admittedly, in spite of regular admonitions, Mrs. Goldstein let a week pass before reporting the incident. Asked to name the juror making the remark, she said, "I believe she was Mrs. Williams." The latter, on recollection, denied the remark. No other juror would assert hearing her do so. It was entirely reasonable for the trial court to determine that the report was insufficiently supported by credible evidence (*People* v. *McDuffee*, 270 App. Div. 1067) and to take the position that, since the record disclosed " no untruthful answers to any questions propounded to these jurors * * * the trial judge was justified in holding that there was no intentional concealment." (*People* v. *Rosen*, 251 App. Div. 584, 591, affd. 275 N. Y. 627.) Admittedly the question posed the trial court was serious in its implications. It was handled with care and caution and, we hold, correctly.

Nor do we find error on the part of the trial court in respect to defendant's application to examine the Grand Jury minutes for cross-examination of People's witnesses. Such minutes were used by the prosecution to refresh the recollection of its witnesses and for the purpose of correcting their testimony. In each instance the minutes were submitted to the trial court for inspection for contradictory or inconsistent matter. (*People* v. *Walsh,* 262 N. Y. 140, 149.) The minutes had not been used in the cross-examination of witnesses as was the case in *People* v. *Miller* (257 N. Y. 54) and in *People* v. *Kelley* (253 App. Div. 430). In *People* v. *Pauley* (281 App. Div. 223, 225) it was said, " One such error [constraining the court to reverse] was the *refusal of the court to examine* the Grand Jury testimony of certain witnesses for the People *so as to determine whether to make the same available to the defendants for use upon the cross-examination of such witnesses to test or impeach their credibility.*" (Emphasis supplied.)

Reversal of the convictions on counts relating to section 986 is sought on the ground that that section is the " book-making " statute. The scope of actions characterized by that section as misdemeanors is broad, including book-making, but not exclusively. " It is, rather, a listing of a number of different kinds of acts or conduct, all of them related to ' book-making ', but each of which is, separately, made a misdemeanor." (*People* v. *Erickson,* 302 N. Y. 461, 465.) Nor are convictions under sections 986 and 973 of the Penal Law incompatible. The two sections refer to entirely separate and distinct offenses and are mutually exclusive. (*People* v. *Bruno,* 281 App. Div. 941.)

In our opinion no error resulted by reason of a failure to merge the counts of the respective indictments accusing defendant of being a common gambler. It is not the intention of section 970 that, regardless of the number of spots in which a person may concurrently engage in activities proscribed by the section, he shall be deemed to have committed but one misdemeanor.

The trial of this keenly contested case lasted about four weeks. It involved many diverse, involved and complicated questions and was accompanied by various incidents of the nature here discussed. A consideration of the record indicates that the Trial Justice conducted himself and the trial with complete fairness. It may be noted that, with one minor exception as to a matter of terminology, no exception was taken to his charge in chief.

There are assignments of error and claimed prejudice other than those here commented upon, none of which we deem of sufficient merit to justify reversal. One of such calls, however, for a modification of the judgment of sentence.

Defendant was sentenced by, among other things, fine of $500 on each of the counts in the three indictments upon which he was tried and convicted. He was also sentenced to serve one year in the Saratoga County jail under each of his three convictions for being a common gambler, but the execution of that sentence was suspended and defendant placed on probation. He was tried on three common gambling counts, but acquitted by the jury on that count in The Brook indictment. Judgment should be modified, therefore, by reducing the total of fines by $500 and specifying the jail sentence, execution of which was suspended, to be under each of the two convictions for being a common gambler and, as so modified, affirmed.

FOSTER, P. J., BERGAN and HALPERN, JJ., concur; COON, J., not voting.

Judgment of conviction modified, on the law and facts, by reducing the total of fines by $500, and specifying the jail sentence, execution of which was suspended, to be under each of the two convictions for being a common gambler, and as so modified, affirmed.