THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
FREDERICK A. SPRINGER and LARRY B. DENNO, Appellants.

Third Department, April 23, 1987

APPEARANCES OF COUNSEL

*Elan Y. Cherney* for Frederick A. Springer, appellant.

*Jeffrey V. Canale* for Larry B. Denno, appellant.

*Gordon M. Hemmett, Jr., District Attorney (Robert M. Winn* of counsel), for respondent.

### OPINION OF THE COURT

LEVINE, J.

Defendants, Frederick A. Springer and Larry B. Denno, were jointly indicted with Robert Middleton for arson in the third degree and conspiracy in the fourth degree (to commit the same arson), arising out of a fire at a vacant house owned by Denno at 36 Maple Street in the Village of Hudson Falls, Washington County, which occurred at about 4:00 A.M. on July 19, 1984. At the trial, the evidence was overwhelming

and essentially uncontested that the fire was of an incendiary origin. A gasoline can was found in the house, there was a strong odor of gasoline at the scene and forensic evidence established that gasoline had been an accelerant in the fire. Additionally, a neighbor testified that she saw a man with a mask and gloves carrying a gas can outside the house at about 1:00 A.M. on July 19, 1984 and observed him apparently entering the house through the rear door.

The principal evidence linking defendants and Middleton to the crime came from the testimony of Frank Pallor. Pallor described having been contacted by Springer in early June 1984 as to whether he could arrange for the arson and being recontacted some three weeks later. He then approached Middleton, who agreed to actually set the fire. When Pallor reported this to Springer, he was told how to contact Denno by telephone. Pallor and Denno arranged to meet at a Lum's Restaurant in South Glens Falls, located near Denno's place of business. At the meeting they agreed on a price of $3,500 for the arson, $1,500 for Middleton and $1,000 each for Pallor and Springer. Pallor recontacted Middleton, who insisted on advance payment of $300. At their next meeting at Lum's, Denno gave Pallor the $300 for Middleton and a key to the rear door of the house for gaining entry. In early July, Pallor took Middleton to Maple Street to point out the house and rear entrance and they secreted a can of gasoline in the vicinity. About two days after the fire, Pallor again met Denno at Lum's, receiving $1,000 for himself and $1,250 for Middleton, the latter representing the balance of what was due Middleton and an additional $50 as a reward for the success of the operation. Pallor was led to understand that the $1,000 due Springer would be paid directly by Denno. In exchange for these payments, Pallor returned Denno's key to the rear door. When Pallor later met with Middleton to pay him his share, Middleton related how he had worn a mask and gloves and used the key to enter the rear door of the house at about 1:00 A.M., then waited several hours before starting the fire because of the presence of several police cars cruising on Maple Street.

The remaining prosecution evidence was as follows: the rear door of Denno's house was not forcibly entered; Denno withdrew $300 in cash from a bank account about one week before the fire and $2,500 in cash from that account the day following the fire; because the house was vacant, insurance coverage on it was limited to fire loss and the house was not insured for

vandalism; in fact, it had been repeatedly vandalized. The last item of prosecution evidence was the testimony of a police officer as to an exchange between Springer and Denno that he overheard when they were arrested for the crime some three weeks after the fire and he was escorting Springer to join Denno in a holding cell area. As they approached Denno, the two men greeted each other. Then Springer said, "Looks like they got us", to which Denno replied "Sh".

Denno took the witness stand in his own defense. He admitted meeting twice with Pallor, whom he had not known before, at Lum's in June 1984. He explained that the purpose of their contact was to discuss whether Pallor would be hired to paint another house Denno owned. Denno also conceded that he had been attempting to sell 36 Maple Street for four months, without success, that vandalism at the house had been a serious and frustrating problem and that he regretted having ever purchased the property. He also stated that the rear door to the house was securely locked. His explanation for the withdrawal of $2,500 in cash on July 20 was that he had planned to take his family to Niagara Falls for a weekend vacation and intended to buy his wife a porcelain doll there in anticipation of her birthday the following month.

The jury acquitted Middleton of both counts of the indictment, and Springer and Denno were acquitted of the arson count but convicted of conspiracy. Each received a sentence of six months in jail, five years' probation and a $2,500 fine. These appeals ensued.

Defendants' primary argument for reversal is that there was insufficient corroborative evidence of Pallor's testimony to sustain their convictions. Pallor was an accomplice as a matter of law. Consequently, the convictions cannot stand unless there was "corroborative evidence tending to connect" each defendant with the conspiracy (CPL 60.22 [1]). The statutory requirement of such corroboration has long been a part of our law, reflecting the well-founded suspicion concerning the credibility of accomplice testimony. The inherent risk of unreliable accomplice testimony is guarded against by insuring that inculpation of the accused in the crime does not depend entirely on the possibly fabricated version of the accomplice (see, People v Hudson, 51 NY2d 233, 238-239). The requisite corroborative evidence must be truly independent; it is not satisfied by evidence merely bolstering the testimony of the accomplice or lending credibility to the details of his testimony (supra, at 238). It must be "evidence from an indepen-

dent source of some material fact tending to show that defendant was implicated in the crime" *(People v Kress,* 284 NY 452, 460). This does not mean, however, that the corroborative evidence must prove guilt *(see, People v Hudson, supra,* at 238), or even actually connect defendant with the commission of the crime *(see, People v Dixon,* 231 NY 111, 116). Moreover, the elements of independent proof are to be considered cumulatively and not in isolation *(see, People v Hudson, supra,* at 240), for "[m]atters in themselves of seeming indifference or light trifles of the time and place of persons meeting may so harmonize with the accomplice's narrative as to have a tendency to furnish the necessary connection between defendant and the crime" *(People v Dixon, supra,* at 116-117). In other words, the essential corroboration is a quantum of independent, material evidence, i.e., probative of a fact in issue as to guilt, of sufficient weight to support a reasonable inference that defendant was somehow implicated in the commission of the crime. If so, it does not matter that individual pieces of evidence could also give rise to nonincriminatory inferences or be subject to an innocent connotation *(see, People v Hudson, supra,* at 240; *People v Morhouse,* 21 NY2d 66, 74).

To illustrate from the case law, in *People v Cunningham* (64 AD2d 722, *affd* 48 NY2d 938), the independent proof in a prosecution for illegal drug sales was that the accomplice wired $200 to the defendant in California and the apprehension of the accomplice two weeks later in possession of a large quantity of drugs. This was held sufficient to corroborate the accomplice's testimony that the money was sent as part of a prearranged plan for the defendant to buy drugs in California and send them to the accomplice in New York. In *People v Hudson (supra),* a grocery store robbery conviction was sustained primarily on the basis of accomplice testimony, supported by the otherwise innocuous presence of the defendant as a patron in the store at the time of the crime, together with somewhat suspicious behavior on his part which had the indirect effect of furthering the execution of the robbery and aiding the perpetrators to escape without apprehension.

Measured by the foregoing criteria, we are of the view that there was sufficient corroboration of Pallor's testimony to sustain both convictions. As to Denno, there was some evidence probative of motive. Denno was anxious to rid himself of the property, which was an expense and a source of aggravation from recurring and threats of future acts of vandalism, for which his fire insurance policy did not provide coverage.

By his own testimony,* he admitted meetings with Pallor, theretofore a total stranger, during a period which could readily be inferred as the planning stage of the arson. He withdrew an unusually large sum of cash on the very next day following the fire, and the jury could easily discredit his less than plausible explanation that this was for a weekend family excursion and the purchase of a modest birthday gift for his wife. The arsonist gained access to the house through an ordinarily locked back door without having to force entrance, a fact suggestive of collusion with the owner. Finally, Denno's postarrest response to Springer's, "Looks like they got us", could reasonably be interpreted as an attempt by Denno to stifle any additional remarks which would further incriminate both of them. As such, it was probative of consciousness of guilt (see, People v Shilitano, 218 NY 161, 179; People v Potter, 50 AD2d 410, 413; People v Tuscillo, 229 App Div 240, 241, affd 255 NY 543). While perhaps several of the foregoing pieces of evidence considered separately would not be sufficient or, in isolation, appear innocuous, the independent proof "taken cumulatively, could support a reasonable inference that [Denno] was an adjunct to the [conspiracy]" (People v Hudson, supra, at 240). Thus, it satisfied the statutory requirement of corroboration "tending to connect" him with the conspiracy to commit arson.

Turning to the corroborative evidence of Springer's complicity in the crime, the only independent proof was his statement to Denno, "Looks like they got us", after his arrest. The statement clearly can be viewed as an inculpatory admission. Of separate corroborative significance is the fact that Springer's statement was made to Denno, a close friend whom other evidence established as a coconspirator, at their very first encounter after both were arrested for setting the fire at Denno's house some three weeks earlier. In this context, Springer's remark is not only inculpatory in its content but is perhaps even more revealing of complicity for what apparently did *not need* to be said, i.e., expressions of indignation, incredulity or at least bewilderment as to what this charge concerning an arson at his friend's house was all about. The absence of such natural reactions supports an inference of Springer's awareness of underlying facts which by itself is

---

* In submitting a defense after the People rested, Denno assumed the risk that he would inadvertently supply a deficiency in the People's case (see, People v Kirkpatrick, 32 NY2d 17, 21, appeal dismissed 414 US 948).

highly suggestive of an *association* between him and Denno in the criminal enterprise *(see, People v Cunningham,* 64 AD2d 722, *supra).*

The case of *People v Moses* (63 NY2d 299), heavily relied upon by Springer, is distinguishable in two respects. First, Springer's motive in making an *incriminatory* admission while speaking to Denno is far less subject to the inherent ambiguities in interpretation that exist in the making of a false *exculpatory* statement in response to police interrogation *(cf., supra,* at 308). Second, as already discussed, the verbal act of making this statement to another perpetrator under the circumstances that then prevailed was separately probative of criminal association. These factors, plus the manner in which other independent evidence closely dovetailed with Pallor's narrative, connected Springer with the crime sufficiently to assure that Pallor was telling the truth *(see, People v Daniels,* 37 NY2d 624, 630).

■ The remaining points raised by defendants do not require extended discussion. Among them, defendants claim that, since the only overt act alleged in the conspiracy count of the indictment was Middleton's setting of the fire identically described in the arson count, their conviction for conspiracy was fatally inconsistent with the acquittal of all three defendants on the arson count. Defendants, however, failed to object to the repugnancy before the jury was discharged and, therefore, are precluded from raising the issue on appeal *(see, People v Alfaro,* 66 NY2d 985). In any event, the verdicts were not repugnant. In establishing the conspiracy, the prosecution was not limited to proof solely on the overt act alleged in the indictment. Conspiracy is an embracive crime, covering all of the overt acts and substantive crimes in the persisting criminal enterprise, proof of any of which may support a conviction *(see, People v Vera,* 47 NY2d 825, 826; *People v Abbamonte,* 43 NY2d 74, 85). Since there was ample evidence of other conduct which the jury could find was in furtherance of the conspiracy, the arson acquittal was not inconsistent with the finding of guilt as to conspiracy *(see, People v Tucker,* 55 NY2d 1, 7). Under the same analysis, i.e., that the setting of the fire by Middleton was not a necessary element of proof of the conspiracy, any lack of clarity in County Court's instructions, or failure of clarification in response to the jury's questions, as to whether Middleton's setting the fire was an essential element of the conspiracy was not prejudicial to defendants *(see, People v Malloy,* 55 NY2d 296, 302, *cert denied* 459 US 847).

Accordingly, defendants' convictions should be affirmed in all respects.

MAHONEY, P. J., KANE, WEISS and YESAWICH, JR., JJ., concur.

Judgments affirmed.