THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* JOSEPH KRESS, Appellant.

Argued October 9, 1940; decided December 31, 1940.

*I. Maurice Wormser* and *Vincent R. Impellitteri* for appellant.

*Joseph F. Hanley, Acting District Attorney (Henry J. Walsh* of counsel), for respondent.

RIPPEY, J. About twelve-thirty o'clock on the afternoon of August 21, 1934, the operator and men in charge of one of the armored trucks of the United States Trucking Company were held up in front of the office of the Rubel Ice Company at Bay Nineteenth street and Cropsey avenue in the borough of Brooklyn, city of New_York, and robbed of $427,950 in cash contained in ten separate bags which they were transporting for various banks.

In the fall of 1938, John J. (Archie) Stewart, who also had various aliases, told the authorities that nine men besides himself committed the crime. At that time, three of those named by him (Francis Oley, John Manning and Benny McMahon) were dead. Stewart was not indicted. An indictment was filed on November 3, 1938, against John Oley, Percy Geary, Stewart Wallace, Joseph Kress, Thomas Quinn and John Hughes for the commission of the crimes of robbery in the first degree, grand larceny in the first degree and assault in the first degree. Since the whereabouts of Hughes was unknown and Oley and Geary were in the Federal prison at Alcatraz Island, upon a severance the trial proceeded in June, 1939, against Wallace, Quinn and Kress. Each was convicted of robbery. The larceny and assault counts were dismissed at the trial. The judgment of conviction of Kress was affirmed by the

456

Appellate Division by a vote of three to two and, upon permission of one of the dissenting justices, Kress appeals to this court.

None of the occupants of the truck was able to identify any of those who participated in the robbery except Stewart, upon whose testimony the People relied and without which Kress could not have been convicted. Stewart, by his own words, conceived the crime and planned its execution, directed and supervised the preparation of each of the actors for the part he should take in its execution, supervised and directed the actors in its execution and in their getaway, fixed the shares of the participants in and supervised the distribution of the loot and retained the major part for himself. Stewart testified that the crime had been conceived by him early in June, 1934, that, from time to time as the plan for consummating the robbery was worked out, he selected new members for the gang and had nine meetings at which details of the plans were rehearsed, at none of which Kress was present. On the ninth meeting, as part of his plan, it developed that it was necessary to have two automobiles and McMahon and Manning said they knew a man by the name of Kress who would supply them. At a later meeting in July, Kress was present with various other members of the mob and Manning informed Kress that a couple of automobiles were necessary and Kress said that he would procure them and store them in his uncle's garage on Atlantic avenue. Stewart testified that Kress was present at subsequent meetings and also performed his part, as planned, at the time of the robbery, which was to provide the automobiles to be used in the getaway. At one of those meetings Manning said that he was supplied with enough pistols for all and McMahon observed that he had several machine guns and suggested that a boat was required and that he knew a man by the name of Hughes who could supply it. That suggestion is alleged by Stewart to have brought Hughes into the picture at their next meeting. It was explained

that they wished to leave from a dock as near the Rubel plant as possible and Hughes produced a lobster dory with which the party went over the route proposed to be taken after the robbery had been consummated. At a subsequent meeting held by Stewart on August 8th with all of the members of the outfit except Quinn, Hughes said that he would like to include his partner Quinn in the enterprise. It developed that Quinn had a speedboat and Quinn was taken in. It was then decided that both boats should be used in the getaway. Stewart testified that the first time he saw the speedboat was at Ninety-sixth street in the North river when Manning, Hughes and a mechanic (who later developed to be one Charles Schlayer) were present and that Kress, Hughes, the mechanic and he went on a trial trip up and down the Hudson river as far as One Hundred and Fifty-fifth or One Hundred and Sixtieth street and finally pulled over by the Ford plant at Edgewater in New Jersey. In the automobiles that Kress furnished, he said, the gang left the Rubel plant after the robbery with their loot and went to the point in the river where the speedboat and lobster dory were docked in which they all proceeded in their flight from the scene of the robbery. McMahon accidentally shot himself while in one of the boats, was taken to a hideout by Stewart and others where a doctor was procured for him and where he subsequently died. Stewart claimed that out of the share of the loot which he received Kress agreed to contribute part of the expenses of the medical care and burial of McMahon. Kress, he said, gave him $150 of this amount and promised to contribute the balance later. On subsequent occasions he demanded the balance of the money but did not get it. He testified that he saw Kress in 1937 in Sing Sing Prison and had a talk with him. He was then in need of money with which to print papers on his appeal from his conviction for bank robbery for which he was incarcerated and for counsel fees and said to Kress, " I need the money you owe me," and Kress said, " All right, I will make arrangements for you to receive it. * * * Have you

got somebody you can send down to the brother-in-law of mine? " Stewart continued: " I said ' Yes.' " Whereupon Kress gave Stewart the name of Harold Harkavy and his address at 141 Broadway. Some days afterward, Stewart testified, he saw Kress again and told him that his (Stewart's) brother had gone to Harkavy for the money but did not receive any, so he asked Kress, " What is the matter? " and Kress replied, " Well, there is something holding it up," but that he would have a word with his brother-in-law again. In the meantime Stewart had talked with his own brother about the matter. He was removed to Dannemora two days after the conversation with Kress and had no further conversations with him. From this brief outline of Stewart's testimony enough has been said for the purpose of considering the principal questions involved upon this appeal.

It is, at this point, important to advert to the character of the man upon whose testimony the conviction of Kress depended and to the probable motive or motives for testifying. Stewart admitted that he was convicted of burglary in 1916 while he was a juvenile and received a suspended sentence, again in 1919 for robbery with a gun and sentenced to imprisonment for seven and one-half to fourteen years, and in January, 1937, for robbery of the Pine Bush National Bank, Pine Bush, New York, for which he was, at the time of the trial, serving a sentence in Dannemora State Prison of from thirty to sixty years and that variously, between times of incarceration, he ran speak-easies, book games and crap games and was a gambler, bootlegger and beer runner and a gunman protector for crap games. He was also a perjurer as occasion might demand. At the time that Stewart agreed to furnish the information as to transactions concerning which he testified at the trial, he also had a brother who was a probationary police officer awaiting permanent employment with the New York city police force. He was allegedly trying to curry favor with the then Commissioner of Corrections and he had a grudge to settle with Kress who had refused to be his victim in a

shakedown. With those motivating interests he required payment in advance of the consideration fixed by himself for his testimony, *i. e.*, a promise of immunity from prosecution. He doubtless visioned the effect such a conviction would have on any application for a probation on the sentence that he was then serving and upon favor with the authorities which his aid might give to the end that his freedom on probation might be hastened. *Additionally, testifying would settle his score with Kress.* It was then, it is claimed, that he started his build-up of corroboration to make certain the conviction of Kress. There were contradictions and improbabilities in his testimony and it did not always square with other established facts. Much of the foregoing was for the consideration of the jury on the question of Stewart's credibility and the reliability of his story and not for this court to weigh and evaluate. We refer to it as indicating the character of the accomplice and some of the reasons why the truth of his statement was open to the gravest suspicion and why it became necessary, to warrant conviction of Kress, to have corroborative evidence of a definite, legal character, independent of the testimony of Stewart, tending to connect Kress with the commission of the crime (*People* v. *Reddy,* 261 N. Y. 479; *People* v. *Crum,* 272 N. Y. 348, 353).

Stewart was by his own testimony an accomplice of Kress and the court so charged as matter of law. The courts have always looked with suspicion upon the testimony of an accomplice and have asserted that it must be accepted only with caution, especially when the accomplice has bought his freedom from prosecution by a promise to give testimony against defendant or is, himself, a disreputable and criminal character (*People* v. *Katz,* 209 N. Y. 311, 336; *People* v. *Becker,* 215 N. Y. 126, 140; *People* v. *Cohen,* 223 N. Y. 406, 412; *People* v. *Crum, supra;* 7 Wigmore on Evidence [3d ed.], § 2058). Accordingly, the Legislature has provided that " a conviction cannot be had upon the testimony of an accomplice, unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the crime " (Code Crim. Proc. § 399).

This and other courts have, on many occasions, been required to consider the kind of corroboration in the particular case under consideration that is necessary to satisfy the law. We need not pause to review all the decisions separately. The required corroborative testimony is insufficient if it tends only to establish the credibility of the accomplice. The statute does not say that there may be a conviction on the testimony of the accomplice alone if shown to be credible. The corroborative evidence to have any value must be evidence from an independent source of some material fact tending to show that defendant was implicated in the crime (*People* v. *Hooghkerk*, 96 N. Y. 149, 162). The *independent* evidence must be material evidence *other* than that of the accomplice and must fairly and reasonably *tend to connect the defendant with the commission of the crime* (*People* v. *Everhardt*, 104 N. Y. 591, 594; *People* v. *Taleisnik*, 225 N. Y. 489, 493; *People* v. *Reddy*, *supra;* *People* v. *Ogle*, 104 N. Y. 511, 515; *People* v. *O'Farrell*, 175 N. Y. 323). It may not depend for its weight and probative value upon the testimony of the accomplice. It need not, alone and by itself, establish that defendant committed the crime. But where the corroborative evidence standing alone has no *real* tendency to connect defendant with the commission of the crime, it is insufficient (*People* v. *Reddy*, *supra*, p. 586; *People* v. *Crum*, *supra;* *People* v. *O'Farrell*, *supra*). Evidence of mere association of defendant with perpetrators of the crime at a time antecedent to its commission is insufficient (*People* v. *Cohen*, *supra;* 22 C. J. S., Criminal Law, pp. 1397–1399). Additionally, where the corroborative evidence does not show actual participation of defendant in the crime itself, the fact must also be established, independently of the testimony of the accomplice, that any such association was of such a character and of such intimate connection with the criminal enterprise that it may be inferred that it tends to connect the defendant with the commission of the crime. "Its connection with defendant's own statements and denials should be considered. * * * It may

vary in its nature according to the circumstances of the particular case " (*People* v. *Dixon*, 231 N. Y. 111, 116). With those applicable statements of the law in mind, the first question for us to determine is whether the People furnished such corroboration as the law requires.

To meet the requirements of the law and secure the conviction of Kress, the People relied upon two matters only for corroboration, namely, the matter relating to the $500 which Stewart alleged Kress agreed to repay him, and secondly, the matter of the trip which Stewart, Hughes and Kress took with the mechanic in the speedboat. Kress took the witness stand in his own behalf and denied any participation in the events leading up to the robbery, in the robbery itself or in the getaway or division of the loot or acquaintance with any of the participants except Manning. He said that he owed Stewart no money whatsoever and had never met him prior to the occasion when he saw him in Sing Sing Prison and that he had never seen the mechanic who was alleged to have repaired the speedboat until he saw him at the trial. He denied circumstantially and in detail all testimony of Stewart by which the latter sought to connect him with the crime. Kress admitted that he talked with Stewart in Sing Sing Prison in 1937 when he (Kress) was serving time on a conviction for having possession of a gun. His story of the meeting differed radically from Stewart's version. Kress testified that he was talking with some of the fellows and said that he had a brother-in-law who was a lawyer who was looking after his own case and would see whether it was worth while to take an appeal, whereupon Stewart, who overheard the remark, mentioned his appeal in connection with the Pine Bush Bank robbery and inquired of him as to whether he (Kress) had a brother-in-law who was a lawyer, and when informed that he had, Stewart secured his name and address. Kress testified that Stewart then told him that Manning had said that he (Kress) supplied the cars for the Rubel job and that he had given Kress $3,500 but that he found out later that Kress had nothing to do with it;

that he (Kress) then told Stewart that he had nothing to do with supplying cars for the Rubel job or for any other job. He further testified that Stewart then said, " Listen, Kress, I have a very expensive lawyer handling my appeal, and I need dough. I don't care where or how I get it. I got my brother hustling all over New York, but I don't care how or where he gets it either. I want you to kick back that dough or else it will be just too bad for you." Thereupon Kress said, " Listen, Stewart, I never received a dime, not even a penny. I never received a nickel from anybody for that, and furthermore, I won't give you a cent." Thereupon Stewart said, " We'll see about that.   *   *   * You are liable to get hurt." A couple of days afterwards Stewart was transferred to Dannemora Prison. Kress testified that at no time did he authorize Stewart to send his brother Robert to the office of Harkavy or authorize his parents or Harkavy to turn over any money to Stewart's brother or father; that his father and mother came up to see him at Sing Sing and they told him about certain threats that had been made by Robert Stewart, whereupon he told them the story and definitely told them that they must not give Stewart anything.

Harkavy was called for the People and testified that in the early part of June, 1937, he received a telephone call when the voice at the other end said: " This is Robert Stewart calling, and I would like to see you on a matter concerning your brother-in-law, Joe Kress," whereupon an appointment was made for the following day and Stewart came to his office and told him that he was a brother of Archie Stewart who had been convicted for holding up the Pine Bush Bank and had been sentenced to serve a term of from thirty to sixty years and that an appeal was being taken from that conviction, that the family had retained an attorney to handle it who required a large sum of money and that he expected a contribution from the family of Joe Kress; that he told Stewart that he would not give him a cent and that Joe's parents had no money belonging to Joe and that there was no reason why they

should contribute a cent for the appeal. He said that Stewart again later called him on the telephone and asked him whether he had any money for him and Harkavy told him that he had not and also told him, " Joe's parents have spoken to Joe and Joe said that he sees no reason at all why he should give Archie a cent," whereupon he told Stewart that he would not give him anything and Stewart asked to come to the office immediately to see him. When Robert Stewart came to the office he said, " I cannot understand your attitude. I don't see why Joe's parents are not kicking in, * * * you know it would be rather unhealthy for Joe if a contribution was not made." He said, " You know Archie could make it pretty hot for Joe, make things very uncomfortable for Joe." Harkavy finally told him that he would do nothing about it but he would tell Joe's parents about it. He said that Stewart again called him on the telephone and inquired whether he had the money and when informed that he did not have it he said he would come back in a few days and see whether he had it then. Other conversations occurred, according to the witness' testimony, when Stewart asked him for money and finally he said to Stewart: " Your threat worked and has scared Joe's mother to such an extent that he has given me — Joe's father has given me some money for you," whereupon Robert Stewart sent his father around to get it. That money he paid to Stewart's father, John J. Stewart. Harkavy testified that he was not authorized to give any money to Stewart's father and had told Stewart that Kress had told his parents not to give any money. The father, John J. Stewart, testified that he went to Harkavy's law office at the request of his son Robert and received an envelope with $100 in it, and that he had never met Kress. Robert Stewart testified that he went down to Harkavy's office on several occasions, demanded $350 and after $100 had been paid demanded $250 more but personally received no money from Harkavy although he was engaged in collecting and had collected upwards of $900 for Archie's appeal expenses.

The fact of payment of $100 was not the vital point. Without establishing the reason for the payment and authority or knowledge and consent of Kress to the payment such testimony was not corroborative evidence as required by the statute. The testimony concerning the reason for the payment which would furnish evidence tending to connect the defendant with the commission of the crime is that of the accomplice only. Thus the attempt to connect the defendant with the commission of the crime by the testimony of the $100 payment rests upon the testimony of the accomplice himself and is insufficient. There was no evidence whatever to the effect that Kress had authorized the payment of the $100 to Robert Stewart or to Stewart's parents or to any one else nor any evidence from which any such inference could be drawn unless it was from the evidence of the accomplice. Such a payment could corroborate the testimony of the accomplice as to the existence of the debt only if the payment were made and received directly or indirectly from the person indebted. The unauthorized acts of third parties may not be used to connect the defendant with the commission of the crime (*People* v. *Buzzi,* 238 N. Y. 390; *People* v. *Pignataro,* 263 N. Y. 229). The evidence was objected to and admitted only over defendant's exception and the court refused to withhold it from the jury. Thus they were allowed to speculate as to the authorization by the defendant of the payment of moneys owing by him to reimburse Stewart for moneys advanced in connection with McMahon's death and burial and to find in the evidence of Harkavy the corroboration required by the statute. Not only that, but counsel for Kress requested the court to charge that unless the People proved beyond a reasonable doubt that Kress knew of or authorized the payment the evidence could not be considered as corroboration of the testimony of Stewart. This the court refused to charge and exception was taken. Under no authority or rule of law could the testimony be considered by the jury as corroboration. It fails to meet the test required by the statute and the authorities to permit

its consideration as a test of the credibility of the accomplice witness. We cannot presume that the jury failed to find the corroboration, which the court instructed them was necessary for a conviction of Kress, in the testimony concerning the payment of the $100 (*People* v. *Lazar*, 271 N. Y. 27; *People* v. *Taleisnik, supra*). The fact must not be overlooked that Kress was at no time and by no witness identified as a participant in the robbery except by Stewart.

Schlayer, the mechanic who was alleged by the accomplice to have repaired the motorboat, was called on behalf of the People and testified that he had known Hughes and Quinn for some time and had repaired the motorboat in question for them; that in the latter part of July, 1934, he was asked by Quinn or Hughes again to make some repairs to the boat and that in the early part of August he made a second test of the boat in the water with Hughes, John Oley, Archie Stewart and a man, whom he identified in the court room as the defendant Kress, with him in the boat. He did not know Kress personally or by name prior to that occasion and that was the only time that he saw him prior to the trial. His identification of the defendant was at least dubious. Schlayer knew nothing about the plans of Stewart and the rest of them for the perpetration of the crime and had nothing to do with the perfection of those plans and, at most, his testimony amounts to just this and nothing more, *i. e.*, that he saw Kress in the presence of Stewart, Hughes and Oley some ten days prior to the robbery. It does not necessarily follow that the presence of Kress in the boat indicated that he took part in the robbery. There is nothing in Schlayer's testimony, directly or by inference, which tends to connect Kress with the commission of the crime. Since none of the victims of the robbery identified Kress, the testimony of Schlayer, who also does not identify Kress with the robbery, so far as it goes is merely an agreement with the story of the accomplice and is worthless under the statute as a bolster to the credibility of Stewart's testimony or independently corroborative of his testimony

as tending to connect the defendant with the commission of the crime. If the testimony had established that Kress was at the scene of the robbery in association with Stewart and the other participants at or immediately before the time of the robbery, it might, perhaps, be urged that his denial of being there imported some evil motive (*People* v. *Mayhew,* 150 N. Y. 346, 353; *People* v. *Dixon, supra,* p. 117; *People* v. *Deitsch,* 237 N. Y. 300, 303; *People* v. *Crum, supra,* p. 356), but nothing of that kind appears in this case. From the testimony of Schlayer evil intent cannot be inferred. His testimony should not have been submitted to the jury as sufficient to supply the required corroboration of the testimony of the accomplice and defendant has been protected against its erroneous submission by suitable objections, requests and exceptions.

Other errors were committed on the trial which were material and could not be overlooked but need not be referred to in detail in view of what has been said above. Reference should be made, however, to two incidents occurring at the trial. Immediately prior to the close of the evidence the defendant was recalled to the stand for further cross-examination. During the People's main case it was brought out that the two cars used in the robbery were stolen cars. The defendant had admitted that he was convicted of petty larceny in 1932. When the defendant was recalled, the district attorney was allowed over proper objection to bring out that the larceny admitted involved an automobile, obviously for the purpose of creating in the minds of the jury the impression that the defendant was endowed with a propensity either for stealing automobiles or for committing crimes involving automobiles. Also the district attorney was allowed to question the defendant as to whether he had ever suffered from a venereal disease without any pretense being made to show its materiality. These incidents prejudiced the defendant before the jury (*People* v. *Malkin,* 250 N. Y. 185; *People* v. *Zackowitz,* 254 N. Y. 192; *People* v. *Richardson,* 222 N. Y. 103; *People* v. *Russell,* 266 N. Y. 147) and it is not

sufficient to say, as is urged here, that these matters were " more or less innocuous." If at the trial it was not thought that these questions might help to convict the defendant, they would never have been asked.

The judgments should be reversed and a new trial ordered.

FINCH, J. (dissenting). It is submitted that the verdict of the jury convicting defendant appellant of the crime of robbery in the first degree should be affirmed. The facts detailing the planning and execution of the robbery down to the minutest detail, including the part which each participant took in effecting the robbery and the escape, have been set forth in the testimony of an accomplice. Up to within a comparatively recent time, and prior to the enactment of section 399 of the Code of Criminal Procedure, a jury, if satisfied of the truth of the statement of an accomplice, could convict on his testimony alone. (*People* v. *Costello*, 1 Den. 83; *People* v. *Dyle*, 21 N. Y. 578; *Dunn* v. *People*, 29 N. Y. 523; *Linsday* v. *People*, 63 N. Y. 143, 154.) It was at that time that the courts were accustomed to charge the jury to scrutinize the testimony of an accomplice with caution. Thereafter, by statute, the State of New York required that there be some independent evidence to connect the defendant with the commission of the crime. (Code Crim. Proc. § 399.) We have held that the corroborative evidence need not show the commission of the crime; it need not even show that the defendant was connected with the commission of the crime. (*People* v. *Mayhew*, 150 N. Y. 346, 353; *People* v. *Swersky*, 216 N. Y. 471, 478, 480; *People* v. *Cohen*, 223 N. Y. 406, 426; *People* v. *Dixon*, 231 N. Y. 111, 116; *People* v. *Reddy*, 261 N. Y. 479, 484.) Such evidence is sufficient if it tends to connect the defendant with the commission of the crime. Corroboration is not restricted to any particular point. It may vary in its nature according to the evidence in the particular case. Matters in themselves of seeming indifference or trifling evidence may have a tendency to furnish the necessary connection between the defendant and the crime.

(*People* v. *Becker*, 215 N. Y. 126, 139, 140; *People* v. *Dixon*, 231 N. Y. 111; *People* v. *Reddy*, 261 N. Y. 479, 484.)

The sole question of law upon which it is proposed to reverse and dismiss the indictment is that the trial court should have charged the jury that as a matter of law the testimony concerning the following incidents did not constitute any evidence which the jury might find tended to connect the defendant with the commission of the crime.

The first incident relates to the presence of this defendant with others of the conspirators on a trial trip of the speedboat utilized in the getaway with the bags of money after the robbery. The presence of this defendant, in company with others of the conspirators, on the trial trip of the speedboat to test its availability, was detailed by an independent witness, namely, the mechanic who had reconditioned the speedboat. The defendant denied his presence on the speedboat. His presence on the boat, therefore, became a question of fact for the jury, and although the Appellate Division divided as to the availability of the evidence detailing the second incident, there was unanimous agreement that the evidence concerning the presence on the speedboat of this defendant with others of the conspirators, to test the availability of the boat, " assumed a sinister significance and was sufficient corroboratory evidence. (*People* v. *Dietsch*, 237 N. Y. 300; *People* v. *Dixon*, 231 id. 111, 117; *People* v. *Crumb*, 272 id. 348, 356; *People* v. *Mayhew*, 150 id. 346, 353.) " (259 App. Div. 738.) Surely after the evidence set forth in the majority opinion of the details of this crime, a court could not say as a matter of law that the presence of this defendant with others of the conspirators passing on the availability of the speedboat used in the getaway, was not some independent evidence which tended to connect this defendant with the commission of the crime.

We come then to the second incident, which concerns the payment of $100 by the father of this defendant to his son-in-law, to be turned over to Robert Stewart, the brother

of Archie Stewart. In connection with this incident it is conceded that, pursuant to the threats to the defendant by Archie Stewart, to induce the payment of some money, the father and mother of defendant visited him while he was in prison, and talked with him concerning the advisability of making some payment on account of this debt which Archie Stewart claimed of the defendant. The defendant concedes the visit of the father and mother, the talk concerning the advisability of payment, and thereafter the payment by the father to his son-in-law, who paid the money to the father of the accomplice. After these conceded facts the defendant testified that he had told the father not to make the payment. Since the defendant was an interested witness, the jury were at liberty to accept that part of his testimony wherein he admits all the above conceded facts, and to disbelieve his self-serving declarations that he advised his father against making the payment. (*People* v. *Johnson*, 185 N. Y. 219, 225; *People* v. *Demasco*, 240 N. Y. 170.) As to this incident also it is submitted that the trial court could not say as a matter of law that there was not some evidence here, however slight, which, if believed by the jury, tended to connect the defendant with the commission of the crime.

It is submitted, therefore, that evidence concerning both the above incidents was property admitted, and that there was no error on either of these grounds.

Since the lack of sufficient corroborative evidence is urged as the sole basis for setting aside the verdict of the jury and ordering a new trial, it follows that the judgment appealed from should be affirmed.

LEHMAN, Ch. J., LOUGHRAN, SEARS, LEWIS and CONWAY, JJ., concur with RIPPEY, J.; FINCH, J., dissents in opinion.

Judgments reversed, etc.