THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* THEW J. ICE, Appellant.

Third Department, November 11, 1942.

*Bernard Weiss, Nellie Childs Smith* and *John D. Lyons* for appellant.

*William Deckelman, District Attorney* (*Frederick W. V. Shadt* of counsel), for respondent.

HILL, P. J. Appellant has been sentenced to prison for fifteen to twenty years for first degree arson. He was convicted of participating in the burning of his leasehold, The Silver Grill Restaurant in Sullivan county, upon the evidence of Jack Rason, who testified that he was employed to kindle the fire. The equipment and furnishings in the grill belonged to appellant and were insured, but there is no claim of over-insurance.

The District Attorney in his summation argued appellant's motive was that the insurance would relieve his extreme financial involvement, and that it would permit him to get back seven or eight thousand dollars which it was conceded he had invested in equipping the building as a grill. The tenuousness of this reasoning is disclosed by an examination of the evidence. The trial of the case extended into the third week, and in the mass of evidence the jury may well have overlooked the obvious answer to the District Attorney's claim. The Silver Grill was a profitable venture, and its business was increasing. Shortly before the place burned, appellant was absent in the West for about a month, and the business was conducted by People's witness Lonney Marshall, who had complete control under a power of attorney. He says that the average income was from $130 to $140 a day, and that he knew the amount of profit — fifty per cent on liquor, ten to thirty per cent on food, and twelve to fourteen dollars on a nine dollar investment in a half barrel of

beer. The District Attorney established that the aggregate of appellant's indebtedness was $3,980.50, consisting of a note negotiated at a bank for a little over $1,000, whereon there were overdue and unpaid instalments amounting to $143.12, current bills ranging from $33 to $265 for electricity, groceries, beer, liquor, candy, advertising, et cetera, an unpaid balance of $647.14 on an automobile and $200 on a piano, $200 unpaid salary and $150 borrowed money to the witness Marshall, $300 to a former employee, People's witness Stell, who said he had made other loans to appellant which had been repaid, and that he was not worried about this indebtedness. On the other side of the account, appellant had between $300 and $400 on deposit in a Middletown bank, $146 in a Sullivan county bank, and $449.28 in the Bowery Savings Bank. With these deposits, aggregating nearly $1,000, and a profitable business, the District Attorney's argument as to motive is not sustained.

The corroboration necessary under section 399 (Code Crim. Proc.) "to have any value must be evidence from an independent source of some material fact tending to show that defendant was implicated in the crime * * *. The *independent* evidence must be material evidence *other* than that of the accomplice and must fairly and reasonably *tend to connect the defendant with the commission of the crime* * * *. It may not depend for its weight and probative value upon the testimony of the accomplice." (*People* v. *Kress,* 284 N. Y. 452, 460.) " 'What appears to be required is, that there should be some fact deposed to, independently altogether of the evidence of the accomplice, which, taken by itself, leads to the inference not only that a crime has been committed, but that the prisoner is implicated in it.' " (*People* v. *O'Farrell,* 175 N. Y. 323, 325; *People* v. *Taleisnik,* 225 N. Y. 489, 493.) Speaking concerning the corroboration required, it is said in the opinion in *People* v. *Josephs* (143 App. Div. 534, 536), "It is not with the thief that the connection must be had, but with the commission of the crime itself." The court stated the law to be substantially as quoted above, the error arose when he applied it to the facts. He said, "In pointing out some of the evidence which is claimed to be corroborative of the testimony of Jack Rason, the court expresses no opinion. You may reject it if you see fit. You may accept it if you see fit." He then enumerated the following items: The visits by appellant to the restaurant of Mrs. Rason looking for Jack; appellant's conversation and the fact that finally he found Jack and visited with him fifteen or twenty minutes; the payment by appellant of a ten dollar fine to obtain

Jack's release from jail where he had been committed for beating his wife; the visits by appellant and Jack to automobile garages looking for a second-hand car. There was very little evidence which could be classified as corroborative under the rule (Code Crim. Proc. § 399). It was prejudicial error for the court to permit the jury to consider these visits to Jack and the other proof mentioned as being corroborative under the rule. It is doubtful if they corroborated Jack's testimony of the crime, as he was in appellant's employ, engaged in the renovation of another hotel.

Evidence given by an insurance agent, Lane, might be considered as corroborative, if it has any weight. Shortly before the fire the agent suggested to appellant a ten percent reduction in the policy, making its face $7,605. In connection with the reduction the agent testified: "Q. And, as a matter of fact, if he had urged you to keep the $8450 would you have recommended keeping the $8450? A. I would." The claimed incriminating statement by appellant is described by the witness. "Well, I was in — I would go in there frequently when I was up in the territory — not less than once a month — sometimes a couple times a month." Concerning a visit in June or July and before the policy was reduced, the following is related: "Q. Tell us what if anything Dr. Ice said to you at that time or what you said to Dr. Ice. * * * A. Well — Q. (interrupting) Just tell us what talk there was there that day. A. We were talking about conditions — business conditions — * * * the gist of the conversation was that he asked me ' if I knew of anybody he could get to burn his property.' Q. That was in July or June of '41? A. That's right. Q. And what did you say to him then? A. I merely laughed. Q. That was all the conversation? A. I think so. * * * Q. Don't you feel that you owed a duty to your company, when he told you that, to immediately cancel? A. No. Q. Why? A. I didn't take it seriously. Q. Do you take it seriously now? A. I wonder about it. * * * Q. Do you think he was serious in asking you to get someone to burn his property? A. At that time, no. Q. Do you think at this time he was serious in asking you to get somebody to burn his property? A. I told you I am in doubt about it. Q. If you did get him somebody, what would be his chances of collecting from the company? A. What? Q. If you had recommended somebody, and that person burned the building, what would be his chances of collecting from the company?" An objection by the district attorney to this question was sustained. "Q. And weren't you surprised when he said that to you? A. No. Q. Why? A. 'Doc' and I used to talk a lot about things — we were good friends —

and there had been other losses that there was some talk about and he was kidding about me and frequently did. Q. What other losses that he had? A. I don't say he had — losses that I had sustained in the country".

This is the strongest, if not the only competent, evidence of corroboration under the rule. It should be given no weight. It is unbelievable that appellant, talking with the agent who insured his property about suspicious fires, would inquire seriously if the agent knew of anyone who would burn that property, and that months after, this agent would renew appellant's policy.

The District Attorney refers to a five gallon can of kerosene as an incriminating item. A fireman, Godfrey, testified to finding such a can upstairs, saying, "Well, after we had cut off our big lines of hose, we found there was some smouldering fire in the second story — on going up there with a booster line to extinguish that fire — mere debris, that was — we found a five-gallon can — I kicked a five-gallon can — it was practically full of something." He put his finger in and smelled and found it was kerosene. He further said, "There was some charred cinders on top of the can — the can was covered with, I don't know what — clothes or wet aprons — in the process of finding this smouldering fire, which I believed was in this material burning, we uncovered the can. * * * Q. Did you find any other cans around this building or in this building? A. No — I didn't." This can, practically full and on the second floor, in no way interlocks with Jack's story of setting the fire in the boiler room on the first floor, after emptying a can of kerosene on inflammable material, neither is appellant in any way connected with it.

Men of good character have committed crimes. The experience is that they are less likely to do so than those with bad character. This appellant, who had been a practicing dentist, member of the Wyoming State Board of Dental Examiners, a Captain in the First World War, the father of a young man who had been appointed and was a student at West Point, is not the type which ordinarily in adult years would commit a crime of this kind. The record should be subjected to close scrutiny.

There was not sufficient proof of corroboration under the rule to satisfy legal requirements, and the case should not have been sent to the jury.

HEFFERNAN and SCHENCK, JJ., concur; CRAPSER and BLISS, JJ., dissent.

Judgment of conviction reversed on the law and facts and a new trial granted.