THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RAFAEL DAVILA, Appellant.

Second Department, April 29, 1985

### APPEARANCES OF COUNSEL

*S. G. Farruggio* for appellant.

*Elizabeth Holtzman, District Attorney (Gerald Allen, Barbara D. Underwood, Michael Gore* and *Barri Bloom* of counsel), for respondent.

### OPINION OF THE COURT

MOLLEN, P. J.

The primary question presented on this appeal is whether the People presented sufficient evidence to corroborate the accomplice's trial testimony, which inculpated the defendant in the death of Fred Aikins. We conclude that the evidence was sufficient and therefore affirm.

On March 16, 1979, at approximately 12:10 A.M., Richard Simmons, a New York City Transit Authority bus operator, who had just pulled out of a bus depot, spotted Fred Aikins lying on

the ground near a cemetery. Aikins, who appeared to be "hurt bad", was taken to Lutheran Memorial Medical Center where he died at approximately 12:55 A.M. An autopsy was performed later that day, and the medical examiner determined that Aikins died from two bullet wounds "of the face and neck, with involvement of the brain". The wounds were inflicted at a distance of some 6 to 18 inches.

Several hours after Aikins was found, Thomas Bradshaw was taken into custody in connection with Aikins' death. Bradshaw admitted his involvement but accused Rafael Davila, the defendant, of actually shooting Aikins. The defendant was also taken into custody and, though he admitted being with Aikins, Bradshaw, and a third person, during the evening of March 15, he denied any participation in the homicide. He further denied any knowledge of the facts and circumstances surrounding the homicide, including the homicide itself. The defendant suggested that sometime after he and Bradshaw parted company that evening, the latter, acting alone, might have killed Aikins.

The defendant was released from custody after his interrogation by an Assistant District Attorney. However, Bradshaw was arrested and charged in connection with Aikins' death. He subsequently pleaded guilty to manslaughter in the first degree and was sentenced to an indeterminate term of imprisonment of 5 years to 15 years. As part of the plea agreement, Bradshaw promised to testify against the defendant.

By Kings County indictment number 2894/80, the defendant was accused of murder in the second degree and criminal possession of a weapon in the second degree. At the ensuing trial, the People principally relied upon Bradshaw's testimony which not only implicated the defendant in the crimes charged but identified him as the person who twice shot Aikins. Bradshaw was employed at the time in question by the Atlantic Boiler Company (Atlantic) and supplemented his income by selling marihuana. The defendant was also employed by Atlantic, and Bradshaw considered him to be a friend.

According to Bradshaw, on March 15, 1979, at 4:00 or 4:30 P.M., he purchased a gun for protection from one Julio Vasquez, a former Atlantic employee. The gun cost $100, some of which he borrowed from the defendant. Bradshaw brought the gun to Atlantic's basement and showed it to the defendant. Bradshaw and the defendant "had a few beers" and talked "about the gun, how it works".

Later that same afternoon, Vasquez and "three other guys", stole money from Bradshaw at gunpoint. Bradshaw had in-

tended to use the money to purchase a color television from Vasquez, which Vasquez had earlier offered to sell to him.

After reporting the incident to the police, Bradshaw returned to the basement and complained to the defendant about how he was "getting ripped off". Among others, he mentioned one incident in which Aikins allegedly stole some marihuana from him. The defendant replied: " 'Why don't you just take [Atlantic's] van and we can go and get him.' " Bradshaw decided "to go out and see [Aikins] to see if he had any of [his] money". The defendant tested the gun by firing it twice into the back yard, commenting that "it was powerful".

At approximately 6:30 or 7:00 P.M., Bradshaw and the defendant took the van out of the shop. The defendant had the gun. They "rode around" for some 30 minutes and went to Billie Bartlett's house. Bartlett's mother told Bradshaw that her son was working at a delicatessen and gave him the address. Bradshaw wanted "to ask [Bartlett] where [Aikins] was". Bartlett and Aikins were cousins.

At approximately 9:45 P.M., Bradshaw and the defendant arrived at the delicatessen. Bradshaw entered the store alone and briefly spoke with Bartlett about "going to * * * a party". Bradshaw told Bartlett that he would wait for him in the van; Bartlett left the delicatessen at about 10:10 P.M., carrying a six-pack of beer, entered the van and drove to Shore Road in Brooklyn with Bradshaw and the defendant.

While they were drinking the beer, Bradshaw asked Bartlett if he knew where Aikins was; Bartlett responded that he might be at the Lighthouse Bar or at home. The threesome drove to the bar and, upon discovering that Aikins was not there, they then drove to Aikins' house. Bradshaw asked Bartlett "to go in and get [Aikins]" and instructed Bartlett not to disclose that Bradshaw was waiting for him in the van. Bradshaw wanted to surprise him. Moments later, Aikins emerged from his house with Bartlett and agreed "to party" with Bradshaw, the defendant, and Bartlett. They purchased another six-pack of beer and drove to Shore Road and 92nd Street in Brooklyn where they "drank the six pack and smoked a few joints".

After some 45 minutes, Bradshaw drove to the Lighthouse Bar, and "dropped off" Bartlett and Aikins at the latter's request. Bradshaw parked the van in a bus stop and the defendant asked him if he wanted the defendant to get Aikins out of the bar. Bradshaw responded, " 'All right bring him out and we will talk to him' [about] [t]he money he owe[s] me". The defendant returned to the van with Aikins 5 or 10 minutes later. Aikins

asked Bradshaw "what do [you] have to get high with[?]"; Bradshaw responded, " 'Don't worry' ", whereupon both the defendant and Aikins reentered the van.

Bradshaw then drove Aikins and the defendant to a school yard where they parked. A couple of minutes later Bradshaw asked Aikins about his money. Aikins replied that "he didn't have any money now". Suddenly, the defendant, who was in the rear of the van between the driver's and passenger's seats, shot Aikins in the back of the neck.

Nervous, Bradshaw drove the van from the school yard in the direction of a cemetery. He went through two red lights and could hear Aikins breathing. As they approached the cemetery, the defendant shot Aikins a second time. The defendant was laughing and said " 'Don't worry about it, we're not going to get caught. You don't have to worry. Keep your mouth shut.' " At the cemetery, the defendant "leaned over [the] passenger seat * * * opened up the door * * * pushed [Aikins] out * * * and he closed the door".

From there, Bradshaw and the defendant returned to Atlantic. Bradshaw left the van to open the garage door. The defendant, who was then in the passenger's seat, "jumped into * * * the driver's seat and went to pull the van in. There [was] only enough space so the van could fit in. He hit the right fender on the righthand side of the wall and * * * put a dent in it". Bradshaw parked the van in the garage and closed the door.

At the defendant's direction, Bradshaw filled a bucket with hot water which they used to clean the inside of the van. According to Bradshaw, the defendant said, " 'Here, take this rag, clean off the steering wheel, the insides of the van, so there wouldn't be no [sic] fingerprints' ". In the meantime, the defendant soaked up Aikins' blood, all of which was on the passenger's seat, with two nearby rags. After all apparent traces of the blood were removed, the defendant put the rags in a bag and "dumped [it] across the street" in an empty lot. The defendant told Bradshaw not to worry and promised to " 'come in early tomorrow and * * * we will steam the van down so there will be no blood left' ". The defendant left Atlantic at 2:00 A.M. or 2:30 A.M. with the gun which had been in his possession throughout the evening.

Bradshaw closed the shop after the defendant and, instead of going upstairs to his apartment, he "just walked the streets" until approximately 5:30 A.M. when he returned to Atlantic for work. That same morning, at 9:00 or 9:30, he was taken to a police station. Bradshaw told the police where they could find

the bag containing the bloody rags, having seen the precise spot the bag was thrown by the defendant.

The People also offered the testimony of William Bartlett, Aikins' cousin, who was not implicated in the homicide. He substantiated many of the details of Bradshaw's testimony up to 11:00 or 11:15 P.M., approximately one hour before the crime was committed, when Bartlett and Aikins were left off at a bar by Bradshaw and the defendant. According to Bartlett, Aikins left the bar alone. Medical evidence established a genetic consistency between blood found on the passenger seat of the van and the deceased's blood which "would exclude approximately 99 percent of the population".

Finally, the People presented the testimony of the detective in charge of the investigation into Aikins' death, Fred E. Hazel, and a Kings County Assistant District Attorney, Jon Besunder, concerning two statements purportedly made to them by the defendant after he was taken into custody on March 16, 1979, and was twice advised of his constitutional rights (*see, Miranda v Arizona,* 384 US 436).

According to Detective Hazel, the defendant stated that he and Bradshaw had been "riding around in a company van" looking for someone. They stopped at a delicatessen where they purchased some beer and an acquaintance of Bradshaw's joined them. The threesome "rode around some more, bought some more beer, had some smoke", after which they proceeded to another location where a fourth person, also acquainted with Bradshaw, joined them. The two acquaintances sat in the front of the van and talked; the defendant sat in the rear and did not participate in the conversation because he did not know Bradshaw's acquaintances.

Sometime later that evening, the foursome drove to a bar. Bradshaw remained in the van; the defendant, alone, left the bar after about 5 or 10 minutes because he did not know any of the bar's patrons and no one offered to buy him a drink. He rejoined Bradshaw in the van, and was driven by Bradshaw back to Atlantic. The defendant walked two or three blocks to his apartment, arriving there at approximately 2:00 A.M.

The defendant, *inter alia,* repeated the essence of this statement to Assistant District Attorney Jon Besunder, again admitting that he was with Bradshaw from 7:00 P.M. until approximately 2:00 the next morning, and was with Bradshaw's two acquaintances until approximately 11:00 P.M. when the foursome arrived at the bar. However, the defendant denied shooting Aikins or being present when Aikins was shot. He also

denied that Bradshaw showed him a gun during the night in question.

The defendant also told the Assistant District Attorney that he arrived home at approximately 2:00 A.M. on March 16. When asked how he knew the time of his arrival, the defendant replied: "Because when I came into the house my mother told me 'Why are you coming home so late?' I said what time is it, and she told me 'About a little after two' ". When confronted by the Assistant District Attorney with the fact that Aikins was "found a little after twelve midnight", the defendant denied being with Bradshaw at the time the body was found and stated the following: "No, no, no way, it can't be, no way. Ain't no way it could be found at that time. If it was, my mother's clock was wrong". Moments later, he added, "[W]ell I'll be honest with you, if it was found 12 after 12 or whatever time you say, I know I got home — that is what my mother told me, unless the clock was wrong". Finally, the defendant stated: "Well, like I'm saying, my time could be wrong. My mother's time could be wrong, but I know that when I came home that was the first thing that came out of her mouth that I remember * * * If [Bradshaw] did something, like I said, when I came home that is the time my mother told me like I said, maybe the clock was off. It could have been off time. I remember her telling me when I came in * * * I never shot nobody".

The defendant also told the detective and the Assistant District Attorney that after arriving at work on the morning of March 16 he cleaned his "bosses [sic] son's car" and helped Joseph Pereira, his brother-in-law, to steam clean the van. Pereira, who was not implicated in the crime, was a foreman at Atlantic.

The defendant denied that he cleaned the van when he returned to Atlantic with Bradshaw and further denied seeing any blood in the van. The defendant acknowledged that he used rags to clean the van, commenting that "[t]here was some rags that I had thrown away that had blood on it". He opined that the rags, which ordinarily would be thrown in the garbage and "put in on the side of the shop", were picked up that morning by the garbage collectors. Moments later, the defendant said, "I know they found rags with blood in the van", and then added that he used dirty rags "but there was no blood, there was no blood involved". When shown a bag containing rags, which the Crime Scene Unit had recovered, the defendant stated, "these are not the rags".

The defendant did not testify. Testimony was adduced by the defense, however, to establish the defendant's activities and

whereabouts prior to his meeting with Bradshaw on March 16, 1979, at 7:00 P.M., as well as his activities and whereabouts at midnight or shortly thereafter, when, according to the defense, the defendant returned home. The defense also presented the testimony of the defendant's brother-in-law, Joseph Pereira, which testimony confirmed that they cleaned the van on March 16 and that it was not unusual for them to clean the van as it was used to transport workers, equipment, acid, and horse manure.

At the trial's conclusion, the court instructed the jury that Bradshaw was an accomplice as a matter of law, whose testimony had to be corroborated. The court also instructed the jury to consider both charges set forth in the indictment, as well as manslaughter in the second degree as a lesser included offense of second degree murder. The jury found the defendant not guilty of murder in the second degree and guilty of manslaughter in the second degree and criminal possession of a weapon in the second degree.

On this appeal, the defendant, *inter alia,* contends that the People's evidence was insufficient to corroborate Bradshaw's testimony. The People respond that Bradshaw's testimony was corroborated by evidence which, taken as a whole, satisfied the requirements of CPL 60.22. The corroborative evidence includes the defendant's in-custody statements to an Assistant District Attorney and a detective, which statements contained contradictions evincing a consciousness of guilt. The statements also contained admissions that the defendant was with Bradshaw at the time the crime had to have been committed and that he was with the primary actors in this criminal episode until at least approximately one hour before Aikins was found by the bus driver. The corroborative evidence also included testimony that the defendant steam cleaned the van in which the homicide occurred hours after the body was discovered.

CPL 60.22 in pertinent part provides: "1. A defendant may not be convicted of any offense upon the testimony of an accomplice unsupported by corroborative evidence tending to connect the defendant with the commission of such offense."

Recently, in *People v Moses* (63 NY2d 299, 306), the Court of Appeals explained that the evidence corroborating the accomplice's testimony, "must consist of 'evidence from an independent source of some material fact tending to show that defendant was implicated in the crime' * * * It need only 'connect the defendant with the crime in such a way that the jury may be reasonably satisfied that the accomplice is telling the truth' * * *

Matters of seeming insignificance 'may so harmonize with the accomplice's narrative as to have a tendency to furnish the necessary connection between defendant and the crime' * * * But where the corroboration has no *'real* tendency to [provide such connection], it is insufficient'". Once the Trial Judge concludes that there is some corroborative evidence, "it is his duty to submit it 'to the jury for them to say *first,* whether it was worthy of belief, and *secondly,* whether if true it tended to connect defendant with the commission of the crime'" (*People v Reddy,* 261 NY 479, 484 [emphasis in original], quoting *People v Dixon,* 231 NY 111, 117; *accord, People v Fiore,* 12 NY2d 188, 201-202). The evidence necessary to corroborate an accomplice, moreover, may be supplied by the accused himself (*see, People v Burgin,* 40 NY2d 953; *People v Rushlow,* 94 AD2d 933; *People v Lewis,* 90 AD2d 814; *People v Goldfeld,* 60 AD2d 1, 7).

Viewing the evidence in the light most favorable to the People (*People v Smith,* 55 NY2d 945, 947), we are satisfied that the corroboration was sufficient to sustain the conviction.

First, the defendant admitted in his two statements that during the evening of March 15, 1979, he was with Bradshaw, and two acquaintances of Bradshaw's (presumably Fred Aikins and William Bartlett), in the van in which it was later determined that the homicide occurred; that he was continuously with them until they arrived at the bar, which according to both the defendant and Bartlett, was 11:00 P.M. or 11:15 P.M.; and that he went into the bar with Aikins and Bartlett only to leave the bar some 5 or 10 minutes later and rejoined Bradshaw who was waiting in the van. These admissions were corroborative of some of the details of Bradshaw's testimony leading up to the commission of the crime. In addition, the People offered William Bartlett's testimony which, as previously noted, substantiated many of the details of Bradshaw's testimony up to approximately one hour before the crime was committed when Bartlett and Aikins were left off at the bar by Bradshaw and the defendant.

Second, the defendant stated in essence that he was with Bradshaw from 7:00 P.M. on March 15 until approximately 2:00 A.M. on the 16th when he arrived home, thereby placing himself with Bradshaw at the time that the crime had to have been committed. It was not until the defendant was confronted with the fact that Aikins was found some two hours before the defendant left Bradshaw and returned home that his account of his whereabouts changed. At trial the defense presented two witnesses, including the defendant's father, who testified that

the defendant arrived home at or near midnight. In any event, the defendant's after the fact explanations presented questions of credibility for the jury to resolve (*e.g., People v Fiore,* 12 NY2d 188, 201-202, *supra*). The defendant's admissions that he was with Bradshaw from 7:00 P.M. until 2:00 A.M., a period which included the time when the crime was committed, are corroborative of the accomplice's testimony (*see, People v Kress,* 284 NY 452, 466; *People v Mullens,* 292 NY 408, 416; *People v Laman,* 273 App Div 377, 382-383, *affd* 298 NY 462; *People v Jones,* 76 AD2d 1007, 1008).

Third, the defendant's statements concerning the time he arrived home on March 16, as well as his statements concerning the rags he used to clean the van, contain contradictions, which manifest a consciousness of guilt and are also corroborative of the accomplice's testimony (*see, People v Benzinger,* 36 NY2d 29, 33; *People v Ruberto,* 13 AD2d 844, *affd* 10 NY2d 428, *cert denied* 371 US 842). With regard to the defendant's explanations about the time of his arrival, it is entirely reasonable to infer that one of those explanations was false, thereby evincing a consciousness of guilt. Similarly, by his contradictory statements concerning the rags he used, the defendant attempted to put distance between himself and evidence connecting him with the Aikins homicide from which attempt an inference of guilt may reasonably be drawn.

We are not unmindful of the weaknesses inherent in this species of evidence (*see,* Richardson, Evidence § 167 [Prince 10th ed]). As recently observed by the Court of Appeals in *People v Moses* (63 NY2d 299, 308, *supra*), "[a] false alibi falls into the category of evidence, including flight and analogous conduct, considered indicative of consciousness of guilt and thus of guilt itself * * * Evidence thought to bear on consciousness of guilt has traditionally been considered weak because an innocent person may attempt to extricate himself from a situation by denying incriminating evidence even though he knows it can be truthfully explained or by fleeing from an accuser because of fear of wrongful conviction. Thus, a false alibi may be due not to consciousness of guilt of the crime charged but to consciousness of some incriminating evidence and the justifiable desire to remain free".

In *Moses* (*supra*), the defendant was convicted of felony murder and robbery which occurred in an abandoned building in Manhattan. The conviction rested primarily on an accomplice's testimony. To corroborate this testimony, the People offered into evidence the defendant's videotaped statement in which he said that he was at home in The Bronx at the time in question. He

also stated that he was not in Manhattan at all on the day the crimes were committed and had never been in the abandoned building. A prosecution witness, however, testified that she saw the defendant leaving the crime scene some three hours before the crimes were actually committed.

On appeal the Court of Appeals rejected the People's contention that the defendant's false alibi was sufficient to meet the statutory requirement of corroboration. The court found that under the circumstances therein the evidence of consciousness of guilt was " 'inherently weak' " (63 NY2d 299, 309, *supra*), explaining that, "defendant's presence at the abandoned apartment at least three hours before the crime did not itself tend to connect him with the commission of the crime. There is no evidence that, at the time of defendant's presence, the apartment was in any way associated with the criminal enterprise. Moreover, by the prosecution's own evidence, apartment 4S [the scene of the crime] had previously been used by various people, including defendant, to drink and smoke marihuana, so that his presence there was hardly unusual" (63 NY2d 299, 307-308, *supra*). The court concluded that "there was no evidence that defendant's presence in [the] apartment * * * before the crime was even contemplated was anything but innocent, and thus there is no basis for an inference from his denial that his presence there was a guilty presence" (63 NY2d, at p 308, *supra*).

Unlike *Moses* (*supra*), the contradictory statements relied upon by the People in the case at bar pertain to events which are connected to the crime in such a way as to implicate the defendant in its commission. Under these circumstances, the defendant's subsequent retractions of those statements, when their incriminating nature became apparent, permit the inference urged upon us by the People.

In sum, we conclude that taken as a whole the evidence independent of the accomplice's testimony was sufficient to constitute corroborative evidence, and thus satisfy CPL 60.22 (1).

We have reviewed the defendant's remaining contentions which have been properly preserved and find them to be without merit. We decline to review those issues which have not been preserved.

Titone, Thompson and Weinstein, JJ., concur.

Judgment of the Supreme Court, Kings County, rendered April 5, 1982, affirmed.