THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
DOMINGO VELASQUEZ, Also Known as CANO DOMINGO,
Also Known as J. DOMINGO VELASQUEZ, Appellant.

First Department, November 2, 1989

## APPEARANCES OF COUNSEL

*John Nicholas Iannuzzi* of counsel *(Iannuzzi & Iannuzzi,* attorneys), for appellant.

*Allen H. Saperstein* of counsel *(Peter D. Coddington* with him on the brief; *Robert T. Johnson, District Attorney,* attorney), for respondent.

## OPINION OF THE COURT

SULLIVAN, J.

In this appeal of a conviction arising out of an execution-style triple homicide, the principal issue is whether the record contains sufficient corroborative evidence tending to connect defendant to the crime. The conviction was based almost exclusively on the testimony of the sole witness to the killings, whose complicity was submitted as a question of fact to the jury. A subsidiary issue is also presented as to the propriety of the trial court's charge on accomplice corroboration.

On February 24, 1981, at about 10:00 P.M., after visiting her boyfriend, Johnny Rivera, at Rikers Island, Carmen Alvarez went to the Walton Avenue apartment of Raymond Rodriguez, for whom she sold drugs. Alvarez and Rivera lived with defendant, Domingo Velasquez, and his girlfriend, Miriam Arroyo, who Alvarez had known even before she met defendant. Rivera and defendant were close friends.

Sometime around midnight, defendant appeared at the apartment door, looking for Rodriguez, whose street name was "Pachunga". Alvarez told defendant that Rodriguez was not in and, for security reasons, did not open the door. Defendant departed, returned, and left again when he was told that Rodriguez had not yet arrived.

At about 2:00 A.M. that same night, Rodriguez left his home on Rochambeau Avenue, telling his wife that he would be bringing home Eddie Mendez, another of his drug dealers. About an hour after his departure, Rodriguez, who was carrying a large envelope containing narcotics, arrived with Mendez at the Walton Avenue apartment. Sometime thereafter, defendant returned again and, with Rodriguez' permission, was let into the apartment. At the time, Rodriguez, Alvarez, Mendez and Sylvia Beauchamp, who also sold drugs for defendant, were talking in the living room. After Beauchamp left to go into the bedroom, defendant, who had been discussing the package of narcotics with Rodriguez, asked if he could use the bathroom. Meanwhile, Rodriguez asked Mendez to check out his car from the bedroom window.

At about the same time, Harry, another of Rodriguez' drug dealers, knocked at the front door. As Alvarez walked to the door, she heard a gunshot, and, turning, saw Rodriguez bleeding. Defendant had a gun in his hand. Defendant then entered the bedroom. Alvarez heard four more shots. She could hear Mendez and Beauchamp moaning. When defendant emerged from the bedroom, Alvarez pleaded, "please no"; defendant, however, assured her that he "wasn't going to do [you] anything". Defendant then took a gun and the package of narcotics he had been holding from Rodriguez and reentered the bedroom.

Alvarez heard two more shots from the bedroom. Still holding Rodriguez' gun, defendant came out of the bedroom and told her to turn away. As she did, she heard another shot. When she turned around, she saw defendant removing an object, "like a silencer", from the gun, while Rodriguez lay on

the couch, bleeding. Defendant then told Alvarez to go into the bedroom to see if the police were coming, but she was unable to open the door. After wiping the bathroom and bedroom doors with a cloth to "eras[e] fingerprints," defendant took a silencer from another gun and gave it to Alvarez, who put it in her pocket. Alvarez, who was "afraid," then took the two guns from defendant and put them in her waistband.

After giving Rodriguez' wallet to Alvarez, defendant and Alvarez left the apartment and went across the street to Arroyo's apartment, where Alvarez returned the guns to defendant, who stated that "they had done that" for a "death"[1] that Rodriguez had "caused" many years before. Sometime later, defendant placed the drugs and Rodriguez' papers in a shopping bag, called a taxicab and told Alvarez to make up her "own story" for Rodriguez' family. Defendant then left and, at his request, Alvarez went to Rosa Torres' house, where she told another friend that "they killed Pachunga".

When the police arrived at Rodriguez' apartment after 4:00 A.M. that morning, they found the bodies of Rodriguez on the couch and Mendez and Beauchamp, one on top of the other, behind the door in the bedroom, all dead. The police department's ballistic expert determined that all of the 9mm bullets and .32 caliber bullets recovered from the bodies and casings found in the apartment had been fired from the same two automatic weapons.

In her first interview with the police, on the morning of February 26th, Alvarez told a detective that she was at her friend Rosa's house at the time of the shootings. The detective, not satisfied with her explanation, made arrangements to question Alvarez the next day. Alvarez, however, fled to Massachusetts. While there, she called defendant to tell him that she heard "a lot of rumors" about the shootings, but defendant assured her that everything was "fine". With respect to the story on "the street" that her boyfriend, Rivera, had committed the murders, defendant told Alvarez not to worry because Rivera had been in jail at the time of the crimes.

The detective who had initially interviewed Alvarez located her on April 25, 1981. Still "afraid" and not wanting to be considered an "accomplice", Alvarez gave the detective a

---

1. In other parts of the record the word "death" is transcribed as "debt".

statement which, in large measure, conformed to her testimony at trial.

The defense case consisted essentially of alibi testimony from defendant's girlfriend Arroyo, who stated that she and defendant were together the entire day and evening of the shootings. At about 2:00 or 3:00 A.M., after watching a late movie, the title of which she could not remember, she had gone to bed, leaving defendant alone in the living room. In any event, Arroyo did not see defendant from 3:00 to 7:00 A.M., and did not know whether he had been out of the house during that period. Arroyo did not see Alvarez at her apartment the night of the shootings.

The trial court charged that the question of Alvarez' status as an accomplice presented an issue of fact for jury resolution. In its instructions, the court stated that if the jurors found that she was an accomplice, then defendant could "not be convicted of any of the offenses submitted to you solely upon [her] testimony * * * unsupported by corroborative evidence tending to connect the defendant with the commission of such offenses. In other words, there must be additional evidence of a different character to the same point". The court also charged that an "accomplice means a witness in a criminal action who, according to the evidence adduced at the trial, may reasonably be considered to have participated in the offenses charged in the indictment". More pointedly, the court instructed the jury that should it "determine that Carmen Alvarez was in fact an active participant, an accomplice in the homicides of February 24, 1981, rather than a mere witness" then defendant could not be convicted on her uncorroborated testimony.

■ The jury found defendant guilty of three counts of murder in the second degree. Since we believe that the record is bereft of any corroboration of Alvarez' testimony tending to connect defendant with the commission of the murders, and the jury's verdict did not specify whether it found Alvarez to be a nonaccomplice,[2] we have no way of knowing whether this verdict stands on uncorroborated accomplice testimony. Accordingly, there must be a reversal and a new trial.

"A defendant may not be convicted of any offense upon the testimony of an accomplice unsupported by corroborative evidence tending to connect the defendant with the commis-

---

2. The Criminal Procedure Law does not provide for special verdicts. *(See generally,* CPL arts 310, 320.)

sion of such offense." (CPL 60.22 [1].) Based on the record before us, the trial court properly submitted the question of Alvarez' status as an accomplice to the jury as a question of fact. "[E]ven though a witness is not liable criminally as an accomplice for the offense being tried, the witness may be an accomplice for corroboration purposes if he or she may reasonably be considered to have participated in an offense based upon *some* of the same facts or conduct which make up the offense on trial." *(People v Berger,* 52 NY2d 214, 219 [emphasis in original].) Alvarez, who testified that after the shootings she left the apartment with Rodriguez' wallet, the two murder weapons and a silencer, and who initially denied knowing anything about the killings, could well, in the circumstances presented, have been found not to be an unwilling participant, as she testified, but indeed an accomplice.

The People concede that the question of Alvarez' complicity presented a factual issue but argue that defendant's guilt was proved by a "powerful array" of evidence. Specifically, they cite as satisfying the corroboration requirement the two different caliber shell casings, 9mm and .32 caliber, recovered from the apartment, the 9mm bullets removed from the bodies of Rodriguez and Beauchamp, and 9mm and .32 caliber bullets taken from Mendez' body; the placement of the bodies of Beauchamp and Mendez, one on top of the other, behind the bedroom door, blocking it, and the absence of defendant's fingerprints in the apartment. While such evidence corroborates Alvarez' account as to the manner of the happening of the crime, it in no way tends to connect defendant with the shootings.

To be corroborative the evidence must truly be independent of the accomplice's testimony and must fairly and reasonably tend to connect the defendant with the commission of the crime charged. *(People v Kress,* 284 NY 452; *People v Taleisnik,* 225 NY 489, 493; *People v O'Farrell,* 175 NY 323; *People v Ogle,* 104 NY 511, 515; *People v Everhardt,* 104 NY 591, 594.) Evidence which does no more than tend to establish the credibility of the accomplice is insufficient as a matter of law. *(People v Fiore,* 12 NY2d 188, 201; *People v Kress, supra.)* As the Court of Appeals has noted, "[R]eliance may not to any extent be placed on testimony of the accomplice for to do so would be to rely on a bootstrap." *(People v Hudson,* 51 NY2d 233, 238.)

Since we cannot presume as to how the jury resolved the issue of Alvarez' complicity, the guilty verdict cannot be

upheld, as the People argue, on the speculation that Alvarez was found not to be an accomplice. *(See, People v Feolo,* 284 NY 381, 385; *see also, People v Lazar,* 271 NY 27.) Whenever there is doubt as to whether a conviction is premised on an impermissible ground, the doubt must be resolved in the defendant's favor. *(Ingber v Enzor,* 841 F2d 450, 456; *see, Stromberg v California,* 283 US 359.)

■ Citing *People v Chaitin* (61 NY2d 683, 684) which involved a claim, first raised in the Court of Appeals, that under the language of the indictment charging a Medicaid reimbursement fraud and the instructions of the trial court the jury had to find that the filing of false invoices occurred in Kings County, of which there was an absence of proof, and *People v Cona* (49 NY2d 26, 33, n 2), which involved a charging error on accomplice testimony, the People argue that defendant waived the issue of the insufficiency of the corroboratory evidence since he failed to move to dismiss in the trial court on this ground. As a matter of fundamental constitutional law, the People have the burden of establishing upon sufficient proof every element of the offense charged. *(In re Winship,* 397 US 358; *Jackson v Virginia,* 443 US 307, 313-316; *Brinegar v United States,* 338 US 160, 174.) Thus, insufficiency of proof cannot be waived. *(See, Thompson v Louisville,* 362 US 199, 206; *People v James,* 111 AD2d 254, 255, *affd* 67 NY2d 662; *but see, People v Gomez,* 67 NY2d 843, 844-845.) In any event, lack of corroboration would not be a ground for dismissal since, under the court's formulation of the case in its charge, with which the People agreed, the jury could have found Alvarez to have been a nonaccomplice.

■ Defendant also argues that the court erred in charging that in order for Alvarez to be considered an accomplice she would have had to have participated "in the homicide of February 24th, 1981". In its supplemental charge the court again told the jury that in order to be considered an accomplice Alvarez would have had to have participated "in the events or an offense based upon the same or some of the same facts or conduct which constitute the offense charged, in this case homicide." On both occasions, defendant excepted; in the latter instance, to the inclusion of the phrase, "in this case homicide". We agree that the court's charge constituted reversible error.

CPL 60.22 (2) has, as the Court of Appeals has noted, significantly broadened the definition of an accomplice "in order to provide a more equitable, operable and consistent

standard for the courts in determining when the requirement of corroboration is applicable". *(People v Berger, supra,* 52 NY2d, at 219, citing *People v Basch,* 36 NY2d 154, 157, quoting *People v Beaudet,* 32 NY2d 371, 378.)* As already noted, "even though a witness is not liable criminally as an accomplice for the offense being tried, the witness may be an accomplice for corroboration purposes if he or she may reasonably be considered to have participated in an offense based upon *some* of the same facts or conduct which make up the offense on trial. Significantly, the proof need not show the participation of the witness beyond a reasonable doubt; it is sufficient if the witness may reasonably be considered to have participated. And, of course, the witness need not be actually charged with any offense to be deemed an accomplice". *(People v Berger, supra,* at 219.)

If CPL 60.22 (2) (b) were to be read as the court charged in this case, that is, that in order to be an accomplice a person would have to be a principal in or accessory to the offense charged in the indictment, the subdivision would be rendered meaningless since subdivision (2) (a) provides as a definition of an accomplice one who "may reasonably be considered to have participated in * * * [t]he offense charged". Inasmuch as subdivision (2) (a) is separated from subdivision (2) (b) by the disjunctive "or", we believe the Legislature clearly intended (2) (b) to define and describe circumstances quite different from those defined in (2) (a).

The court's charge constitutes error as a matter of law, since it allows for a finding of noncomplicity if the jury believed that Alvarez was not involved directly in the homicide, even though she may have been a willing participant in a crime, such as robbery or criminal facilitation, based on "the same or some of the same facts or conduct which constitute the offense charged", i.e., homicide. *(Cf., People v Cobos,* 57 NY2d 798.)* The charge departed significantly from the plain language of CPL 60.22 (2) (b) and effectively limited the scope of consideration and deprived the jury of its full fact-finding powers. *(See, People v Stafford,* 57 AD2d 965, 966.)* So imperative is the statute that "[w]hen an accomplice is the People's principal witness, a faulty accomplice charge cannot be reckoned harmless error". *(People v Van Denburg,* 107 AD2d 891.)* Moreover, the language of the supplemental charge concerning corroboration—the last words the jury heard on the subject—not only failed to cure any ambiguity in the original instruction, but confused the issue further.

Accordingly, the judgment of the Supreme Court, Bronx County (Ivan Warner, J.), rendered December 9, 1982, convicting defendant of three counts of murder in the second degree and sentencing him to three consecutive, indeterminate terms of imprisonment of from 25 years to life, to run consecutively to any parole time owed on a previously imposed sentence, should be reversed, on the law, and the matter remanded for a new trial.

MURPHY, P. J., ASCH, ROSENBERGER and WALLACH, JJ., concur.

Judgment, Supreme Court, Bronx County, rendered on December 9, 1982, unanimously reversed, on the law, and the matter remanded for a new trial.